**Marquis & Aurbach**
TERRY A. COFFING, ESQ.
Nevada Bar No. 4949
CRAIG F. ROBINSON, ESQ.
Nevada Bar No. 10205
10001 Park Run Drive
Las Vegas, Nevada 89145
Telephone: (702) 382-0711
Facsimile: (702) 382-5816
tcoffing@marquisaurbach.com
crobinson@marquisaurbach.com
   Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| WMCV PHASE 3, LLC, a Delaware limited liability company, | |
| | Case No.:      2:10-cv-00661-GMN-RJJ |
| Plaintiff, | |
| vs. | |
| SHUSHOK & MCCOY, INC., a Texas corporation; MATTHEW J. TRAVIS, an individual; MATT TURNER, an individual; RICHARD BIRDWELL, an individual; GLOBAL ACCENTS, INC., a California corporation; COUTURE INTERNATIONAL, INC., a Quebec corporation; DOES I through X, inclusive; ROE ENTITIES I through X, inclusive, | |
| Defendants. | |

## OPPOSITION TO DEFENDANTS SHUSHOK & MCCOY INC.'S; MATTHEW J. TRAVIS'; MATT TURNER'S; AND RICHARD BIRDWELL'S MOTION AND SUPPORTING MEMORANDUM TO DISMISS THE COMPLAINT

Plaintiff, WMCV Phase 3, LLC, by and through its attorneys of record, the law firm of Marquis & Aurbach, respectfully submits this Opposition to the Defendants Shushok & McCoy Inc.'s; Matthew J. Travis'; Matt Turner's; And Richard Birdwell's Motion And Supporting Memorandum To Dismiss The Complaint.  This Opposition is made and based upon all the

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

pleadings and papers on file herein, together with the following facts, Memorandum of Points and Authorities, and any oral argument this Court may allow.

Dated this 18th day of June, 2010.

MARQUIS & AURBACH

By  /s/ Craig F. Robinson, Esq.
Terry A. Coffing, Esq.
Nevada Bar No. 4949
Craig F. Robinson, Esq.
Nevada Bar No. 10205
10001 Park Run Drive
Las Vegas, Nevada  89145
Attorneys for Plaintiff

## MEMORANDUM OF POINTS & AUTHORITIES

### I.   INTRODUCTION.

Specific personal jurisdiction exists over each of the Defendants.  Further, each claim for relief alleged by Plaintiff, WMCV Phase 3, LLC ("WMCV"), in its Complaint is pled with the requisite particularity and states a claim upon which relief may be granted.  For the reasons stated herein, Defendants' motion should be denied in its entirety.

### II.   STATEMENT OF FACTS.

#### A.   PLAINTIFF'S RETENTION OF DEFENDANT SHUSHOK & MCCOY, INC., AS ITS COLLECTION AGENT IN RELATION TO PLAINTIFF'S LAS VEGAS BASED TENANTS.

WMCV is the owner of real property located at 455 South Grand Central Pkwy., in Las Vegas, Nevada, part of what is commonly known as the World Market Center Las Vegas ("WMCLV") in Las Vegas, Nevada.[1]   On or about 2007, WMCV retained the services of Defendant Shushok & McCoy, Inc. ("S&M") to act as a its commercial collections agent for the purpose of recovering amounts past due from tenants of WMCLV, including but not limited to amounts due from Defendant-tenants Global Accents, Inc. ("Global Accents"), and Couture

---

[1] See Compl., at ¶¶ 9-10.

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

International, Inc. ("Couture").[2]  S&M did not have any authority to enter into any agreements with any tenants of WMCLV on behalf of WMCV.[3]

### B.   DEFENDANTS' MISREPRESENTATION THAT IT WOULD CEASE CONDUCTING COLLECTION EFFORTS ON BEHALF OF WMCV.

In or about March 2009, WMCV instructed S&M to cease any and all collection efforts with regard to Global Accents; and, on or about June 25, 2009, WMCV instructed S&M to cease any and all collection efforts with regard to Couture.[4]

On or about June 26, 2009, Nino Torres, a "Client Services Manager" for S&M, confirmed and acknowledged in an e-mail that S&M was no longer retained by WMCV as its commercial collections agent, recognizing in part ". . . you [WMCV] are firing us [S&M] . . ."[5] On the same day, Defendant Matthew Travis ("Travis"), as President and CEO of S&M, further confirmed in an e-mail to WMCV that it was no longer retained by WMCV as its commercial collections agent, stating ". . . we [S&M] fired you [WMCV] months ago . . ."[6]

### C.   DEFENDANTS' SUBSEQUENT UNAUTHORIZED ACTS CONCERNING WMCV'S LEASE WITH COUTURE.

On or about July 8, 2009, and purportedly on behalf of WMCV but without WMCV's authorization or knowledge, S&M and/or Defendant Richard Birdwell ("Birdwell") entered into a "Lease Termination And Release Agreement" with Couture, and collected $20,000 as a result thereof.[7]  WMCV has never received said funds from S&M or Birdwell.[8]

Birdwell, acting either individually or as an agent of S&M, signed the "Lease Termination And Release Agreement" with Couture, and represented that he was "Counsel" for

---

[2] Id., at ¶ 29.

[3] Id., at ¶ 30.

[4] Id., at ¶¶ 31-32.

[5] Id., at ¶ 33; see also **Exhibit 1**, attached hereto.

[6] Id., at ¶ 34; see also **Exhibit 1**.

[7] Id., at ¶¶ 35, 42, 43.

[8] Id., at ¶ 48.

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

**MARQUIS & AURBACH**
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711  FAX: (702) 382-5816

"World Market Center Las Vegas, [Inc.]," a nonexistent entity.[9]  Birdwell is not, nor ever has been, an employee, agent, officer, director, or other authorized representative of WMCV, WMCLV, or any other entity related to WMCLV.[10]  Further, Birdwell was never authorized to enter into or execute any agreement on behalf of WMCV, WMCLV, or any other entity related to WMCLV.[11]

Defendant Matthew Travis ("Travis"), as President and CEO of S&M, knew of Birdwell's conduct in executing the "Lease Termination And Release Agreement" with Couture, and ratified or approved the same.[12]  The fact that S&M, Travis, and Birdwell are now all represented by the same defense counsel further confirms this fact.

### D.   DEFENDANTS' SUBSEQUENT UNAUTHORIZED ACTS CONCERNING WMCV'S LEASE WITH GLOBAL ACCENTS.

On or about August 26, 2009, S&M and/or Defendant Matt Turner ("Turner") entered into a "Lease Termination And Release Agreement" with Global Accents and collected $8,200 as a result thereof.[13]  WMCV has never received said funds from S&M or Turner.[14]

Turner, acting either individually or as an agent of S&M, signed the "Lease Termination And Release Agreement" with Global Accents, and represented that he was a "Director" for "World Market Center Las Vegas, [Inc.]," a nonexistent entity.[15]  Turner is not, nor ever has been, an employee, agent, officer, director, or other authorized representative of WMCV, WMCLV, or any other entity related to WMCLV.[16]  Further, Turner was never authorized to

---

[9] Id., at ¶ 43.

[10] Id., at ¶ 44.

[11] Id., at ¶ 45.

[12] Id., at ¶ 72.

[13] Id., at ¶¶ 50, 52, 56.

[14] Id., at ¶ 60.

[15] Id., at ¶ 56.

[16] Id., at ¶ 57.

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

enter into or execute any agreement on behalf of WMCV, WMCLV, or any other entity related to WMCLV.[17]

Travis, as President and CEO of S&M, knew of Turner's conduct in executing the "Lease Termination And Release Agreement" with Global Accents, and ratified or approved the same.[18] The fact that S&M, Travis, and Turner are now all represented by the same defense counsel further confirms this fact.

## III.    MOTION TO DISMISS STANDARD.

Review under Fed. R. Civ. P. 12(b)(6) is essentially a ruling on a question of law.[19]   In considering whether a complaint states a claim upon which relief can be granted, all material allegations in the complaint are accepted as true, and are construed in a light most favorable to plaintiff.[20]   If a plaintiff will not be entitled to relief under any set of facts that would be proven under the allegations in the complaint, the court may dismiss the complaint or portions thereof.[21] Although a Court typically "may look only at the face of the complaint to decide a motion to dismiss," it may nonetheless "consider documents that were referenced extensively in the complaint and were accepted by all parties as authentic . . . without converting the . . . motion into one for summary judgment."[22]

## IV.    SPECIFIC PERSONAL JURISDICTION EXISTS OVER THE DEFENDANTS.

NRS 14.065.1 holds, "[a] court of this state may exercise jurisdiction over a party to a civil action on any basis not inconsistent with the Constitution of this state or the Constitution of the United States."   "Nevada's long-arm statute, NRS 14.065, reaches the limits of due process set by the United States Constitution."[23]

---

[17] Id., at ¶ 58.

[18] Id., at ¶ 72.

[19] North Star Int'l v. Arizona Corp. Comm'n, 720 F.2d 578, 580 (9th Cir. 1983).

[20] Russell v. Landrieu, 621 F.2d 1037 (9th Cir. 1980).

[21] Halet v. Wend Inv. Co., 672 F.2d 1305, 1306 (9th Cir. 1982).

[22] Van Buskirk v. Cable News Network, Inc., 284 F.3d 977, 980 (9th Cir. 2002).

[23] Baker v. Eighth Judicial District Court ex rel. County of Clark, 116 Nev. 527, 531, 999 P.2d 1020, 1033 (2000) (citing Judas Priest v. District Court, 104 Nev. 424, 426, 760 P.2d 137, 138 (1988)).

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

Due Process requires "minimum contacts with [the state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."[24]  Notions of "fair play and substantial justice" have been interpreted by the Supreme Court of the United States to include "fair warning that a particular activity may subject [an individual] to the jurisdiction of a foreign sovereign."[25]  "The defendant must have sufficient contacts with the forum such that he or she could reasonably anticipate being haled into court there."[26]  "Additionally, the exercise of jurisdiction must be reasonable."[27]

"Absent general jurisdiction, specific personal jurisdiction over a defendant may be established only where the cause of action arises from the defendant's contacts with the forum."[28]

A state may exercise specific personal jurisdiction only where: (1) <u>the defendant purposefully avails himself of the privilege of serving the market in the forum</u> or of enjoying the protection of the laws of the forum, <u>or where the defendant purposefully establishes contacts with the forum state and affirmatively directs conduct toward the forum state</u>, and (2) <u>the cause of action arises from that purposeful contact with the forum or conduct targeting the forum.</u>

(emphasis added).[29]  The exercise of jurisdiction must also be reasonable.[30]  However, where the Plaintiff "establishes both prongs one and two, the defendant must come forward with a 'compelling case' that the exercise of jurisdiction would not be reasonable."[31]

## A.   DEFENDANTS PURPOSEFULLY AVAILED THEMSELVES OF THE PRIVILEGE OF SERVING THE NEVADA MARKET.

"The 'purposeful availment' requirement 'may . . . be satisfied if the defendant intentionally directed his activities into the forum.'"[32]  "While the defendant's contacts with the

---

[24] <u>International Shoe Co. v. State of Washington</u>, 326 U.S. 310, 316 (1945).

[25] <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 472 (1985)(citations omitted).

[26] <u>Trump v. Eighth Judicial Dist. Court</u>, 109 Nev. 687, 698-699, 857 P.2d 740, 747-748 (1993).

[27] <u>Id.</u>

[28] <u>Id.</u> (citing <u>Budget Rent-A-Car v. District Court</u>, 108 Nev. 483, 486, 835 P.2d 17, 20 (1992); <u>Price and Sons v. District Court</u>, 108 Nev. 387, 390, 831 P.2d 600, 602 (1992)).

[29] <u>Id.</u> at 699-700, 748.

[30] <u>Schwarzenegger v. Fred Martin Motor Co.</u>, 374 F.3d 797, 800 (9th Cir. 2004).

[31] <u>Boschetto v. Hansing</u>, 539 F.3d 1011, 1016 (9th Cir. 2008) (citing <u>Schwarzenegger</u>, 374 F.3d at 802; <u>Burger King</u>, 471 U.S. at 476-478).

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

forum must be more than 'random,' 'fortuitous,' or 'attenuated [,]' it is the quality of the contacts and not the quantity that confers personal jurisdiction."[33]   Additionally, "[w]hen a defendant creates continuing obligations between itself and residents of the forum, the defendant avails itself of the privilege of conducting business in the forum" and "purposely avail[s] themselves of the benefits and protection of Nevada law."[34]

### 1.   Defendants Expressly Targeted Their Tortious Conduct At WMCV, A Nevada-Based Entity, And Have Therefore Purposefully Availed Themselves Of The Forum.

As held by the Ninth Circuit, "the purposeful direction or availment requirement for specific jurisdiction is analyzed in intentional tort cases under the 'effects' test derived from Calder v. Jones, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)."[35]   "Calder stands for the proposition that purposeful availment is satisfied even by a defendant 'whose only 'contact' with the forum state is the 'purposeful direction' of a foreign act having effect in the forum state.'"[36] "The 'effects' test requires that the defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state."[37]

### a.   Defendants Committed Intentional Acts.

Here, the Defendants are alleged to have committed multiple intentional acts; namely: (1) making fraudulent or intentional misrepresentations;[38] (2) tortiously conspiring with Global

---

[32] Firouzabadi v. First Judicial Dist. Court,110 Nev. 1348, 1353, 885 P.2d 616, 619 (1994) (quoting Trump, 109 Nev. at 700, 857 P.2d at 748).

[33] Id. (citing Trump, 109 Nev. at 700, 857 P.2d at 749; Munley v. District Court, 104 Nev. 492, 495-96, 761 P.2d 414, 416 (1988)).

[34] Levinson v. Second Judicial Dist. Court, 103 Nev. 404, 407-408, 742 P.2d 1024, 1027 (1987) (emphasis added) (citing Burger King Corp., 471 U.S. at 462).

[35] Dole Food Co., Inc. v. Watts, 303 F.3d 1104, 1111 (9th Cir. 2002) (citing Calder v. Jones, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)).

[36] Id. (citing Haisten v. Grass Valley Med. Reimbursement Fund, 784 F.2d 1392, 1397 (9th Cir.1986) (emphases omitted); Bancroft & Masters, Inc. v. Augusta Nat'l, Inc., 223 F.3d 1082, 1087 (9th Cir. 2000)).

[37] Id. (citing Bancroft, 223 F.3d at 1087; Caruth v. Int'l Psychoanalytical Ass'n, 59 F.3d 126, 128 (9th Cir. 1995)).

[38] See Compl., at ¶¶ 68-79.

1   Accents and/or Couture;[39] (3) violating Nevada's civil RICO statutes;[40] (4) converting WMCV's

2   property;[41] and (5) interfering with WMCV's contracts.[42]   Accordingly, the first element of the

3   "effects" test is clearly met.

4           **b.**     **Defendants Aimed Their Intentional Acts At Nevada.**

5        The "express aiming" requirement is satisfied where "the defendant is alleged to have

6   engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of

7   the forum state."[43]   Exemplifying the minimal burdens required to sufficiently establish this

8   requirement, the Ninth Circuit in <u>Dole Food Co., Inc. v. Watts</u>, 303 F.3d 1104, 1111 (9th Cir.

9   2002), found "express aiming" at California where "the defendant sent a letter to Virginia with

10   the alleged intent and result of disrupting the plaintiff's California business."[44]

11        In this case, Defendants' intentional acts explicitly targeted WMCV, whom Defendants

12   clearly knew was a Las Vegas, Nevada, based entity.  Specifically, S&M, by and through Travis,

13   fraudulently misrepresented to WMCV that it had "fired" WMCV months prior to June 26, 2009;

14   thereby representing that S&M and/or its agents had ceased all collection efforts on WMCV's

15   behalf.   Thereafter, Defendants intentionally and tortiously manufactured and executed

16   unauthorized "settlement agreements" purporting to resolve claims between WMCV, Couture,

17   and Global Accents.  S&M, by and through Turner and Birdwell, and with the approval and

18   ratification of Travis, fraudulently executed the unauthorized "settlement agreements" as the

19   ostensible "Director" and "Counsel" for "World Market Center Las Vegas, [Inc.]," a nonexistent

20   entity.  Further, Defendants tortiously conspired to manufacture these fraudulent settlements to

21   undermine WMCV's legal entitlement to payments under the respective leases, with the intent

22

23

24   [39] <u>Id.</u>, at ¶¶ 80-88.

25   [40] <u>Id.</u>, at ¶¶ 89-92.

26   [41] <u>Id.</u>, at ¶¶ 96-103.

   [42] <u>Id.</u>, at ¶¶ 104-111.

27   [43] <u>Dole Food</u>, 303 F.3d at 1111 (citing <u>Bancroft</u>, 223 F.3d at 1087).

28   [44] <u>Id.</u> (citing <u>Bancroft</u>, 223 F.3d at 1087).

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

that WMCV would be forced to rely on and abide by the terms of the fraudulent settlement agreements and be deprived of significant amounts otherwise due under the respective leases.

In committing these acts, Defendants committed fraud, intentionally interfered with WMCV's contracts, converted the purported "settlement proceeds" for their own benefit, and violated Nevada's civil RICO statutes. This conduct explicitly targeted WMCV in Las Vegas, Nevada.

### c.    Defendants' Intentional Acts Harmed WMCV In Nevada.

"[A] corporation can suffer economic harm both where the bad acts occurred and where the corporation has its principal place of business."[45] Further, "[t]he harm could be thought to have been suffered . . . where most of (or at least a threshold fraction of) the corporation's shareholders are located; . . . or where the corporation is incorporated," and "these possibilities are not mutually exclusive."[46] The Ninth Circuit has also recognized that the harm could be suffered where the plaintiff "lived and worked," or where "the negative effects on the plaintiff's reputation would primarily be suffered . . ."[47] Even where the majority of the harm is suffered outside the forum, jurisdiction if property where even a small portion of the harm is suffered in the forum.[48] As such, "jurisdictionally sufficient harm may be suffered in multiple forums."[49]

WMCV is part of WMCLV, owing and operating real property in Las Vegas, Nevada, as part of the largest furniture and home furnishings industry trade show and convention complex in the world. Specific to this action, WMCV owns those WMCLV premises previously leased by Couture and Global Accents. WMCV's greatest asset (if not its sole asset) is the real property at 455 South Grand Central Pkwy., in Las Vegas, Nevada. Defendants directed their intentional and tortious conduct at WMCV in Nevada; and, more specifically, at WMCV's leases with Couture and Global Accents. Defendants knew that their intentional and tortious conduct would

---

[45] Id., at 1113.

[46] Id., at 1113.

[47] Core-Vent Corp. v. Nobel Industries AB, 11 F.3d 1482, 1486 (9th Cir. 1993) (citing Calder v. Jones, 465 U.S. 783, 789-790 (1984)).

[48] Dole Food, 303 F.3d at 1112 (citing Keeton v. Hustler Magazine, 465 U.S. 770 (1984)).

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

harm WMCV, and that at least a portion of the harm (if not all the harm) would be suffered in Nevada.

### 2. Moreover, S&M Developed Continuing Relationships And Obligations With The Forum, Thereby Purposefully Availing Itself Of The Privilege Of Serving The Nevada Market.

Defendant cites to the Ninth Circuit holding in <u>Boschetto v. Hansing</u>, 539 F.3d 1011 (9th Cir. 2008), and its adoption of language from the U.S. Supreme Court in the seminal case of <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462 (1985), in arguing that the contractual relationship between WMCV and S&M "is not enough to establish sufficient contact with [Nevada]."[50]  In <u>Burger King</u>, the U.S. Supreme Court held that "an individual's contract with an out-of-state party *alone* can [not] automatically establish sufficient minimum contacts in the other party's home forum."[51]  Adopting this language, the Ninth Circuit in <u>Boschetto</u> noted that "the lone transaction for the sale of one item does not establish that the Defendants purposefully availed themselves of the privilege of doing business in California."[52]  Accordingly, there is no dispute that a single contract, *with nothing more*, does not *automatically* establish the requisite minimum contacts.   However, <u>Burger King</u> further noted that "with respect to interstate contractual obligations, . . . parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities."[53]  "[P]rior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing . . . must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum."[54]

---

[49] <u>Dole Food</u>, 303 F.3d at 1113.

[50] <u>See</u> Defs.' Mot., at 8:25-9:15.

[51] <u>Burger King Corp.</u>, 471 U.S. at 478 (emphasis in original).

[52] <u>Boschetto v. Hansing</u>, 539 F.3d 1011, 1017 (9th Cir. 2008)

[53] <u>Id.</u>, at 473 (citing <u>Travelers Health Assn. v. Virginia</u>, 339 U.S. 643, 647 (1950); <u>McGee v. International Life Insurance Co.</u>, 355 U.S. 220, 222-223 (1957)).

[54] <u>Id.</u>, at 479.

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1   Here, S&M – by and through Nino Torres ("Mr. Torres"), as S&M's "Client Services

2   Manager" – wrote to WMCLV on June 26, 2009, that "since 2007 you have turned over 64

3   accounts to us, and we have collect on 6, three for balance in full, and three for settlements this is

4   an 11% yield with your company."[55]   In other documents, S&M represents that WMCLV

5   assigned 4 collection accounts to S&M in 2007, 38 collection accounts to S&M in 2008, and 21

6   collection accounts to S&M as of June 2009.   Mr. Torres also references "several attempts to

7   contact" WMCLV employees concerning S&M's collection efforts, as well as "making an

8   appointment with them . . ."[56]  Mr. Torres further indicates that he endeavored "to come together

9   and develop some policies and procedures where by we could collectively go after these debtors

10   with maximum efforts."[57]

11   Unlike the factual situation in <u>Boschetto</u>, which concerned a single "one-shot affair"

12   contract, Mr. Torres' June 26, 2009, e-mail correspondence demonstrates that S&M engaged in

13   significant contact with WMCLV, and created continuing relationships and obligations to both

14   WMCLV and WMCV in Nevada.   As such, S&M purposefully availed itself of the privilege of

15   serving the Nevada market; and, S&M purposefully established contacts with and affirmatively

16   directed conduct towards Nevada.

17   **B.    WMCV'S CLAIMS ARISE FROM DEFENDANTS' CONDUCT
18          TARGETING THE FORUM AND PURPOSEFUL CONTACT WITH THE
               FORUM.**

19   WMCV's claims against the Defendants arise from the multiple intentional acts expressly

20   aimed at and targeting the Las Vegas, Nevada-based WMCV.   Further, WMCV's claims against

21   S&M arise from the continuing relationship and legal obligation created between WMCV and

22   S&M, as its former collections agent.

23

24

25

26   [55] <u>See</u> **Exhibit 1**, attached hereto.

27   [56] <u>Id.</u>

28   [57] <u>Id.</u>

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

**MARQUIS & AURBACH**
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1
2

**C.**     **THIS COURT'S EXERCISE OF SPECIFIC PERSONAL JURISDICTION IS BOTH REASONABLE AND IN ACCORD WITH TRADITIONAL NOTIONS OF FAIR PLAY AND SUBSTANTIAL JUSTICE.**

3

"Once it has been shown that the defendant purposely availed himself of the forum's

4

benefits, the forum's exercise of jurisdiction over him is presumptively reasonable."[58]  "In order

5

to rebut that presumption the defendant 'must present a compelling case' that jurisdiction would,

6

in fact, be unreasonable."[59]  Defendants' contacts with the forum "may be considered in light of

7

other factors to determine whether the assertion of personal jurisdiction would comport with 'fair

8

play and substantial justice.'"[60]   Notions of "fair play and substantial justice" have been

9

interpreted by the U.S. Supreme Court to include "fair warning that a particular activity may

10

subject [an individual] to the jurisdiction of a foreign sovereign."[61]

11

As summarized by the Ninth Circuit in <u>Roth v. Garcia Marquez</u>, 942 F.2d 617 (9th Cir.

12

1991), the Court examines a number of factors in analyzing the reasonableness test for specific

13

personal jurisdiction, those being: "(1) the extent of the defendant's purposeful interjection into

14

the forum state's affairs; (2) the burden on the defendant; (3) conflicts of law between the forum

15

and defendant's home jurisdiction; (4) the forum's interest in adjudicating the dispute; (5) the

16

most efficient judicial resolution of the dispute; (6) the plaintiff's interest in convenient and

17

effective relief; and (7) the existence of an alternative forum."[62]   None of these factors is

18

dispositive, but each weighs in favor of Nevada maintaining jurisdiction in any case.[63]

19
20
21
22

---

[58] <u>Corporate Inv. Business Brokers v. Melcher</u>, 824 F.2d 786, 790 (9th Cir. 1987) (citing <u>Burger King</u>,

23

471 U.S. at 476; <u>Hirsh v. Blue Cross, Blue Shield</u>, 800 F.2d 1474, 1481 (9th Cir.1986)).

[59] <u>Id.</u> (citing <u>Burger King</u>, 471 U.S. at 477).

24

[60] <u>Burger King</u>, 471 U.S. at 476 (citing <u>International Shoe Co.</u>, 326 U.S. at 320)).

25

[61] <u>Id.</u> at 472 (citations omitted).

26

[62] <u>Roth v. Garcia Marquez</u>, 942 F.2d 617, 623 (9th Cir. 1991) (citing <u>Sinatra v. National Enquirer, Inc.</u>,

27

854 F.2d 1191, 1199-1201 (9th Cir. 1988); <u>Insurance Co. of North America v. Marina Salina Cruz</u>, 649 F.2d 1266, 1270 (9th Cir.1981)).

28

[63] <u>Id.</u>

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1.   **WMCV Has Established Defendants' Purposeful Interjection Into The Affairs Of The State of Nevada.**

Though <u>Roth</u> introduces "the extent of the defendant's purposeful interjection into the forum state's affairs" as a factor for consideration, "Ninth Circuit cases give the 'purposeful interjectment' factor no weight once it is shown that the defendant purposefully directed its activities to the forum state."[64]   As discussed hereinabove, Defendants purposefully availed themselves of the State of Nevada, and targeted their conduct at this forum.   Therefore, no weight is afforded to the extent of the Defendant's purposeful interjection into this State's affairs.

2.   **Defendants Fail To Make A "Compelling Case" That This Court's Exercise Of Jurisdiction Would Be Excessively Burdensome.**

Defendants self-servingly posit that the "burden on the defendants of litigating this matter [in Nevada] is great" because "Shushok, Travis, Turner and Birdwell are citizens and residents of Texas."[65]   However, "[u]nless such inconvenience is so great as to constitute a deprivation of due process, it will not overcome clear justifications for the exercise of jurisdiction."[66]   Simply because the Defendants prefer to litigate this action in Texas because they live there does present a "compelling case" for requiring WMCV to travel outside of Nevada in seeking redress for Defendants' bad acts.

3.   **Defendants Have Not Shown A "Conflict Of Laws" Issue.**

Though a factor for consideration, Defendants fail to address whether a conflicts of law issue exists between Nevada and Defendant's home jurisdiction.   With no argument on this point, the Court must presume that no such issue exists.

---

[64] <u>Melcher</u>, 824 F.2d at 790 (9th Cir. 1987) (citing <u>Decker Coal Co. v. Commonwealth Edison Co.</u>, 805 F.2d 834 (9th Cir. 1986); <u>Hirsh</u>, 800 F.2d at 1481; <u>Burger King</u>, 471 U.S. at 477).

[65] <u>See</u> Defs.' Mot., at 11:2-3.

[66] <u>Hirsh</u>, 800 F.2d at 1482 (citing <u>Burger King</u>, 471 U.S. at 483-484; <u>McGee v. International Life Insurance Co.</u>, 355 U.S. 220, 224 (1957)).

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

### 4.    Nevada Has A Substantial Interest In Adjudicating This Dispute.

"Nevada has an interest in providing an effective means of judicial redress for its residents."[67] "Where possible, a Nevada resident should be able to obtain judicial redress in the most convenient, cost-effective manner, . . ."[68] Further, Nevada "possesses a clear interest in protecting" residents of Nevada;[69] and, especially, protecting Nevada-based WMCV as a member the largest furniture and home furnishings industry trade show and convention complex in the world.

### 5.    Efficiency Concerns Dictate That This Court Retain Jurisdiction.

Defendants seem to argue that because they live in Texas, it would be most efficient for WMCV to litigate its claims in Defendants' home state.  Presumably, the "most efficient resolution of the dispute," in Defendants opinion, includes Defendants not needing to incur travel expenses for their depositions, and for Defendants to incur lower costs associated with document production.  Of course, Defendants do not address the fact that WMCV, as the injured party seeking redress from Defendants, would incur additional fees and expenses if forced to litigate outside of Nevada.  Clearly, Defendants' one-sided analysis of judicial efficiency to does not proffer a "compelling case" for the unreasonableness of this Court's exercise of jurisdiction.

### 6.    WMCV's Interest In Convenient And Effective Relief Is Undisputed.

"[N]o doctorate in astrophysics is required to deduce that trying a case where one lives is almost always a plaintiff's preference."[70]  Defendants have conveniently failed to address how litigating this action in Texas, or another forum, could be more convenient or provide more effective relief to WMCV then maintaining this action in Nevada.

---

[67] Trump v. Eighth Judicial Dist. Court, 109 Nev. 687, 703, 857 P.2d 740, 750 (1993).

[68] Id.

[69] Sinatra, 854 F.2d at 1200.

[70] Roth, 942 F.2d at 624.

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

1        **7.      The Existence Of An Alternative Forum Does Not Render This Court's Exercise Of Jurisdiction To Be Unreasonable.**

2

3        Simply because WMCV *could* have filed this action against the Defendants in Texas does

4   not render Nevada's exercise of jurisdiction to be unreasonable; and Defendants wholly fail to

5   present a "compelling case" otherwise.

6        Accordingly, each of the factors enumerated in <u>Roth</u>, <u>supra</u>, weigh in favor of this

7   Court's exercise of specific personal jurisdiction over the Defendants.

8        **D.      IF THE COURT FINDS JURISDICTION LACKING AND/OR UNREASONABLE, WMCV SHOULD BE PERMITTED TO CONDUCT JURISDICTIONAL DISCOVERY PRIOR TO DISMISSAL.**

9

10       "A court may permit discovery to aid in determining whether it has in personam

11  jurisdiction."[71]  "In granting discovery, the trial court is vested with broad discretion . . . [and]

12  [d]iscovery may appropriately be granted where pertinent facts bearing on the question of

13  jurisdiction are controverted or where a more satisfactory showing of the facts is necessary."[72]

14  If, despite the discussion above, the Court is inclined to dismiss the action against Defendants, or

15  any of them, for lack of jurisdiction and/or unreasonableness, WMCV respectfully requests the

16  opportunity to conduct jurisdictional discovery prior to dismissal.

17  **V.      DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED SHOULD BE DENIED.**

18

19       **A.      WMCV HAS SUFFICIENTLY PLED ALL ELEMENTS OF ITS CLAIMS WITH SUFFICIENT PARTICULARITY.**

20       It is undisputed that WMCV's fraud-based claims for fraudulent or intentional

21  misrepresentation, civil conspiracy, and RICO all must be stated with particularity.[73]  To satisfy

22  Rule 9(b) particularity requirements for claims of fraud and those claims which may sound in

23

24  [71] <u>Data Disc, Inc. v. Systems Technology Associates, Inc.</u>, 557 F.2d 1280, 1285 n. 1 (9th Cir. 1977) (citing <u>Wells Fargo & Co. v. Wells Fargo Express Co.</u>, 556 F.2d 406, at 430 n. 24 (9th Cir. 1977)).

25  [72] <u>Id.</u>

26  [73] <u>In re GlenFed Sec. Litig.</u>, 42 F.3d 1541, 1545 n.3 (9th Cir, 1994) ("[Rule 9(b)] . . . makes no distinction
27  between common law fraud and modern statutory causes of action based on fraud."); <u>Schreiber Distributing Co. v. Serv-Well Furniture Co., Inc.</u>, 806 F.2d 1393, 1400-01 (9th Cir. 1986) (applying Rule 9(b) to civil RICO claims); <u>Arroyo v. Wheat</u>, 591 F.Supp. 141, 144 (D.C.Nev. 1984) (applying Rule 9(b)
28  to Section 10(b) cases and common law fraud claims, as well as state law claims).

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

fraud, the complaint must allege specifically the time, place and content of each alleged fraud or misrepresentation.[74]  In addition, "plaintiff must set forth an explanation as to why the statement or omission complained of was false or misleading."[75]   Also, a plaintiff must state with particularity facts demonstrating that the statement was false when made.[76]   Finally, a plaintiff must plead with sufficient particularity attribution of the alleged misrepresentations as to each defendant.[77]  However, The Ninth Circuit has cautioned that the Court should not "make Rule 9(b) carry more weight than it was meant to bear."[78]

### 1.    WMCV Has Pled Fraud With Sufficient Particularity.

In order to prevail on a claim for fraud, a plaintiff has the burden of proving: (1) a false representation made by the defendant; (2) defendant's knowledge or belief that the representation is false (or insufficient basis for making the representation); (3) defendant's intention to induce the plaintiff to act or to refrain from acting in reliance upon the misrepresentation; (4) plaintiff's justifiable reliance upon the misrepresentation; and (5) damage to the plaintiff resulting from such reliance.[79]

### a.    WMCV's Complaint Sufficiently Outlines The False Representations Made By Defendants.

In March 2009, WMCV instructed S&M to cease any and all collection efforts with regard to Global Accents;[80] and, on June 25, 2009, WMCV further instructed S&M to cease any and all collection efforts with regard to Couture.[81]   In fact, in the June 25, 2009, e-mail correspondence sent from WMCV to Mr. Torres, S&M's "Client Services Manager," WMCV

---

[74] Yourish v. Cal. Amplifier, 191 F.3d 983, 993 n. 10 (9th Cir. 1999); Hutchison v. KFC Corporation, 809 F. Supp. 68, 70 (1992).

[75] Id., at 993.

[76] Id.

[77] Lubin v. Sybedon Corp., 688 F. Supp. 1425, 1443 (S.D. Cal., 1988); Woods v. Reno Commodities, Inc., 600 F. Supp. 574, 579 (1984).

[78] In re GlenFed Sec. Litig., 42 F.3d at 1554.

[79] Lubbe v. Barba, 91 Nev. 596, 599, 540 P.2d 115, 117 (1975).

[80] See Compl., at ¶ 31.

[81] Id., at ¶ 32.

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

1   expressly wrote:  "Effectively immediately, Shushok should cease collection efforts on all World

2   Market Center files."[82]

3         The following day, June 26, 2009, S&M – by and through Mr. Torres – responded with a

4   lengthy e-mail, but which included the acknowledgement of ". . . you are firing us."[83]   Travis

5   also responded the same day by e-mail, stating:  "Please waste someone else's time.  And yes <u>we</u>

6   <u>fired you months ago with good reason</u>."[84]

7         As a result of the unambiguous termination of any and all contractual relationships

8   between WMCV and S&M on June 26, 2009, S&M – by and through Travis, as its President and

9   CEO, and Mr. Torres, as its "Client Services Manager" – clearly and unmistakably represented

10  to WMCV that S&M (and, implicitly, its agents, employees, representatives, etc.) had ceased to

11  represent itself as having <u>any</u> authority to act on WMCV's behalf as its collections agent, or

12  otherwise.  WMCV has stated the "who" (S&M, by and through Travis and Mr. Torres), the "to

13  whom" (to WMCV, and specifically, to four of its representatives, as further identified in the e-

14  mail correspondence attached as **Exhibit 1**), the "what" (the content of the alleged

15  misrepresentations as set forth in the attached e-mails and as otherwise pled in the Complaint),

16  the "when" (June 26, 2009), and the "where" (e-mail correspondence between Las Vegas-based

17  WMCV and Texas-based S&M).

18        In addition to the above misrepresentations, "[a] third party can recover damages for a

19  fraudulent misrepresentation if he can establish that he relied upon it to his detriment, and that

20  the defendants intended the misrepresentation to be conveyed to him."[85]   As stated by the

21  *Restatement (Second) of Torts* § 533 (1977):[86]

22        The maker of a fraudulent misrepresentation is subject to liability for pecuniary
      loss to another who acts in justifiable reliance upon it if the misrepresentation,
23    although not made directly to the other, is made to a third person and the maker

---

[82]  <u>See</u> **Exhibit 1**, attached hereto.

[83]  <u>Id.</u>; <u>see also</u> Compl., at ¶ 33.

[84]  <u>Id.</u> (emphasis added); <u>see also</u> Compl., at ¶ 34.

[85]  <u>Peerless Mills, Inc. v. American Tel. & Tel. Co.</u>, 527 F.2d 445, 449 (2d Cir. 1975);

[86]  See <u>Epperson v. Roloff</u>, 102 Nev. 206, 212, 719 P.2d 799, 803 (1986) (embracing *Restatement (Second) of Torts* § 533).

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.

Whether the maker of a fraudulent misrepresentation intended that the misrepresentation be communicated to a third-party, or has reason to believe the misrepresentation would be so communicated, is a question fact.[87]

In this case, S&M and Travis fraudulently misrepresented that S&M had ceased all collections efforts on WMCV's behalf as of June 26, 2009.  Notwithstanding, Turner and Birdwell, acting as agents of S&M with the knowledge and approval of Travis, fraudulently manufactured and executed unauthorized settlement agreements on behalf of WMCV, with the clear intent that the terms of those settlements be communicated by Couture and/or Global Accents to WMCV.  That S&M, Travis, Turner, and Birdwell are now all represented by the same defense counsel further demonstrates the knowledge and authorization or ratification of such conduct by all Defendants.

Defendants' misrepresentations in fabricating such settlement agreements were clearly intended to influence WMCV's future collection efforts as to unpaid amounts due from Couture and/or Global Accents.  With regard to the fraud surrounding the purported settlement agreements, WMCV has stated the "who" (S&M, Travis, Turner and Birdwell), the "what" (the purported settlement agreements executed by Turner and Birdwell, individually or as agents of S&M, and each executed with Travis' knowledge and authorization or ratification), and the "when" (in or about July, 2009, for the alleged settlement agreement with Couture, with the exact date unknown, and August 26, 2009, with regard to the alleged settlement agreement with Global Accents).  As to the "where" aspect of these misrepresentations, WMCV has no actual knowledge of where the fraudulent settlement agreements were signed by the Defendants as that information may only be gleamed from the Defendants themselves.

As such, WMCV has sufficiently pled the requisite misrepresentations for the purposes of its fraud claims.

---

[87] Id.

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

**MARQUIS & AURBACH**
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1

          **b.**     **WMCV Has Alleged Defendants' Knowledge And Intent.**

2         Pursuant to both FRCP 9(b) and NRCP 9(b), "[m]alice, intent, knowledge, and other

3 condition of mind of a person may be averred generally."  "Wherever it is material to allege

4 malice, fraudulent intention, knowledge, or other condition of the mind of any person, it shall be

5 sufficient to allege the same as a fact without setting out the circumstances from which the same

6 is to be inferred."[88]  Accordingly, Defendants' knowledge of falsity and/or intent to defraud does

7 not require heightened particularity in pleading.

8         Here, WMCV has specifically shown that S&M expressly acknowledged its termination

9 as WMCV's collection agent on June 26, 2009, at the latest.  S&M and Travis clearly intended

10 that WMCV would rely on the misrepresentation that S&M had "fired" WMCV as its client

11 months prior to the June 26, 2009, e-mail.

12         Notwithstanding, S&M – by and through the individual Defendants –continued to

13 represent itself as an authorized collections agent for WMCV.  These facts demonstrate the

14 circumstances from which Defendants' June 26, 2009, fraudulent intention and knowledge may

15 be inferred.  Further, Turner and Birdwell, falsely represented themselves to be an ostensible

16 "Director" and "Counsel," respectively, for the Plaintiff, despite clear knowledge that neither of

17 them had any such position or authority, and WMCV has sufficiently pled this lack of

18 authority.[89]  Defendants intended that WMCV rely or, by a ruling from this Court be legally

19 compelled to rely, on the terms and conditions of the purported settlement agreements with

20 Couture and Global Accents, to its detriment.

21           **c.**     **WMCV Justifiably Relied On Defendants' Misrepresentations,
22 And May Be Legally Compelled To Further Rely On The
Misrepresentations Made In The Settlement Agreements.**

23         On June 26, 2009, by virtue of the e-mails from S&M's Mr. Torres and Travis, S&M

24 confirmed that it had ceased all collection efforts on WMCV's behalf.  As evidenced by the

25 Motion to Dismiss filed by Global Accents, WMCV justifiably relied on Defendants' June 26,

26 2009, misrepresentations and did not take affirmative efforts to inform all of its tenants that

27

---

28 [88] In re GlenFed Sec. Litig., 42 F.3d at 1545 (citations omitted).

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1  S&M was not an authorized collection agent for WMCV after June 26, 2009.[90]  Instead, WMCV

2  took the June 26, 2009, e-mails as clear indication that Defendants would immediately cease

3  contacting WMCV's tenants, would immediately cease negotiating settlements on WMCV's

4  behalf; and would immediately cease collecting payments due from WMCV's tenants.

5      WMCV has yet to rely on the terms and conditions of the purported settlement

6  agreements with Couture and Global Accents, and has no intention of doing so absent Court

7  order.  Notwithstanding, Global Accents has moved for summary judgment in this matter, on the

8  grounds that the purported settlement agreement it entered into is a valid and enforceable

9  agreement between it and WMCV.  Though WMCV has opposed this motion, counter-moved for

10  summary judgment, and has reason to believe that Global Accents conspired with S&M, Travis,

11  Turner, and/or Birdwell to fabricate the purported settlement agreement, the possibility remains

12  that this Court may rule said agreement enforceable against WMCV.  By virtue of that ruling,

13  WMCV would be legally compelled (and such compulsion must be deemed justified if by virtue

14  of a ruling by this Court) to rely on Defendants' fraudulent misrepresentations made to Global

15  Accents, and thereby suffer additional damages.

16
17  **d.  WMCV Has Sufficiently Pled Its Damages, As Well As The Future Damages It May Be Legally Compelled To Suffer.**

18      As a result of S&M and Travis' misrepresentations in the June 26, 2009, e-mail

19  correspondence, WMCV did not affirmatively inform all of its tenants of S&M's termination as

20  an authorized collections agent.  However, Defendants – acting with ostensible authority –

21  thereafter fraudulently collected $20,000 of funds otherwise due to WMCV from Couture, which

22  funds have not been turned over to WMCV.[91]  Defendants further collected $8,200 from Global

23

24  [89] See Compl., at ¶¶ 30, 43-46, 57-59.

25  [90] See Def. Global Accents Mot. To Dismiss Or, In The Alternative, Mot. For Summ. J., at 5:4-5
26  ("Plaintiff does not – and cannot – allege that Global Accents had actual or constructive notice of the
    relationship's termination.").  WMCV is by no means acknowledging a duty to inform Global Accents, or
    any other tenant, that S&M was no longer an authorized agent.

27  [91] See Compl., at ¶¶ 42, 48; see also Defs.' Mot., at 5:6-9 & "Ex. B, ¶ 26 (wherein Defendants admit to
28  collection of these funds on WMCV's behalf).

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

Accents, which funds have also not been paid to WMCV.[92]  As such, Defendants have collected at least $28,200 of funds undisputedly due and owing to WMCV; and, WMCV has therefore been damaged.

Additionally, should this Court rule that the settlement agreements entered into by Defendants with Couture and/or Global Accents be valid and enforceable against WMCV, then WMCV will suffer significantly more damage as a result of Defendants' misrepresentations. Specifically, WMCV has expressly alleged that Couture owes in excess of $695,500.32 under its lease,[93] of which $675,500.32 will be rendered uncollectible from Couture should this Court rule that its settlement agreement is valid and enforceable against WMCV.  Further, WMCV has alleged that Global Accents owes in excess of $360,831.00 under its lease,[94] of which $352,631.00 will be rendered uncollectible if this Court finds its settlement agreement to be valid and enforceable.  In total, Defendants' misrepresentations have the potential to damage WMCV well in excess of $1,000,000.

## 2.      WMCV Has Sufficiently Pled Its Civil Conspiracy Claim.

To sufficiently state a claim for civil conspiracy in the State of Nevada, a complaint must state the following:[95]

(1)    Defendants, by acting in concert, intended to accomplish an unlawful objective for the purpose of harming plaintiff; and

(2)    Plaintiff sustained damage resulting from their act or acts.

By comparison, WMCV alleges as follows:

Compl. ¶ 34            On or about June 26, 2009, Travis, as President and CEO of S&M, confirmed in an e-mail to WMCV that it was no longer retained by WMCV as its commercial collections agent.

---

[92] Id., at ¶¶ 55, 60; see also Defs.' Mot., at 5:6-9 & "Ex. B, ¶ 26 (wherein Defendants admit to collection of these funds on WMCV's behalf).

[93] Id., at ¶ 40.

[94] Id., at ¶ 53.

[95] Consolidated Generator-Nevada, Inc. v. Cummins Engine Co., Inc., 114 Nev. 1304, 1311, 971 P.2d 1251, 1256 (1998).

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

**MARQUIS & AURBACH**
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1
2
3

Compl. ¶ 35        Notwithstanding S&M's recognition and acknowledgement that its retention by WMCV was terminated on or before June 26, 2009, S&M entered into a "Lease Termination And Release Agreement" with Couture in or about July, 2009 (the "Alleged Couture Release").

4
5
6

Compl. ¶ 36        The Alleged Couture Release purports to be an agreement between Couture and "World Market Center Las Vegas, a [Nevada Corporation] ("Landlord")," a nonexistent entity.

7
8
9

Compl. ¶ 47        The Alleged Couture Release incorrectly names "Yalu's Corporation" as the "Tenant" in its signature page, but yet was signed by Andre LeFleur, the purported general manager of Couture, on or about July 28, 2009.

10
11

Compl. ¶ 38        The Alleged Couture Release purports to be entered into as of May 21, 2007, the same day that Couture entered into the its lease with WMCV.

12
13

Compl. ¶ 40        As Couture currently owes WMCV in excess of $695,500.32, the Alleged Couture Release purports to have settled Couture's debt for approximately 2.9% of the amount owed.

14
15

Compl. ¶ 41        Pursuant to the Alleged Couture Release, the Couture Lease was allegedly terminated.

16
17

Compl. ¶ 49        On or about January 9, 2010, Couture first informed WMCV of the Alleged Couture Release, and further stated that "Couture is therefore no longer in any dispute with World Market Center."

18
19
20

Compl. ¶ 50        Notwithstanding S&M's recognition and acknowledgement that its retention by WMCV was terminated on or before June 26, 2009, S&M entered into a "Lease Termination And Release Agreement" with Global Accents on or about August 26, 2009 (the "Alleged Global Accents Release").

21
22
23

Compl. ¶ 51        The Alleged Global Accents Release purports to be an agreement between Global Accents and "World Market Center Las Vegas, a [Nevada Corporation] ("Landlord")," a nonexistent entity.

24
25

Compl. ¶ 53        As Global Accents currently owes WMCV in excess of $360,831.00, the Alleged Global Accents Release purports to have settled Global Accents' debt for approximately 2.3% of the amount owed.

26

Compl. ¶ 54        Pursuant to the Alleged Global Accents Release, the Global Accents Lease was allegedly terminated.

27
28

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

| | |
|---|---|
| Global Accents' 5/14/10 Mot. to Dismiss / Summ. J. | Global Accents claims that the Global Accents Release is a valid and enforceable agreement between it and WMCV. |
| Compl. ¶ 81 | Defendants, acting intentionally and in concert with each other and/or others, have conspired to defraud and deceive WMCV by fabricating the unauthorized Alleged Couture Release  and/or the unauthorized Alleged Global Accents Release. |
| Compl. ¶¶ 82-83 | Defendants, acting intentionally and in concert with each other, manufactured the Alleged Global Accents Release and Alleged Couture Release for the purpose of harming WMCV.  Defendants acted so as to convert funds due and owing to WMCV pursuant to the Global Accents Lease and Couture Lease for their own benefit.  Global Accents and Couture acted with the intent of precluding WMCV from collecting the full amounts due and owing under the Global Accents Lease and Couture Lease. |
| Compl. ¶ 84 | Defendants knew or should have known that they were falsely and fraudulently manufacturing and entering into the Alleged Couture Release and Alleged Global Accents Release, for the purposes of defrauding and deceiving WMCV. |
| Compl. ¶ 85 | WMCV was unaware that Defendants fabricated and entered into the Alleged Couture Release and/or the Alleged Global Accents Release at the time said agreements were manufactured and signed. |
| Compl. ¶ 86 | As a direct and proximate cause of Defendants' civil conspiracy, WMCV has suffered damages, the exact amount to be proven at trial. |

Summarizing the allegations enumerated above, Defendants S&M, Travis, Turner, and Birdwell negotiated with Couture, and separately with Global Accents, to manufacture unauthorized settlement agreements with relation to Couture and Global Accents' respective lease obligations.  In return for Defendants S&M, Travis, Turner, and Birdwell's aid in this fraudulent endeavor, Couture seeks to escape a valid debt in excess of $695,500.32 for $20,000, which Defendants S&M, Travis, Turner, and/or Birdwell have pocketed.  Likewise, Global Accents seeks to escape its debt in excess of $360,831.00 for $8,200, which Defendants S&M, Travis, Turner, and/or Birdwell have also pocketed.  In essence, Couture and Global Accents conspired with S&M, Travis, Turner, and/or Birdwell to pay a minute percentage of their debt in exchange for settlement agreements allegedly executed by WMCV, and which Couture and

Page 23 of 36

**MARQUIS & AURBACH**
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1  Global Accents could then utilize as a defense to WMCV's collection attempts.  At the same

2  time, Defendants S&M, Travis, Turner, and/or Birdwell, together or individually, have pocketed

3  approximately $28,200 in payments otherwise owing to WMCV.

4      WMCV has stated the "who" (S&M, Travis, Turner, Birdwell, Couture, and Global

5  Accents), the "what" and "how" (the purported settlement agreements), the "when" (in or about

6  July, 2009, for the alleged settlement agreement with Couture, with the exact date unknown, and

7  August 26, 2009, with regard to the alleged settlement agreement with Global Accents), and the

8  "why" (Couture and Global Accents to escape over $1,000,000 in total debt; S&M, Travis,

9  Turner, and Birdwell to pocket money otherwise due to WMCV).  As to the "where" aspect of

10  this conduct, such knowledge rests with the Defendants.  In any case, WMCV has pled its civil

11  conspiracy claim with the requisite particularity.

### 3.    WMCV Has Sufficiently Pled Its Claims Based Upon Nevada's Racketeer Influenced and Corrupt Organizations ("RICO") Statutes.

14      To properly plead a claim for a violation of Nevada's RICO statute, NRS 207.470, a

15  claim must state the following:[96]

16      (1)    Defendant violated a predicate racketeering act;

17      (2)    Plaintiff suffered injury in his business or property by reason of
              defendant's violation of the predicate racketeering act;

18

19      (3)    Defendant's violation proximately caused plaintiff's injury; and

20      (4)    Plaintiff did not participate in the racketeering violation;

21      By comparison and incorporating the various other allegations addressed hereinabove,

22  WMCV's Complaint states as follows:

23      Compl. ¶ 90      Defendants violated multiple predicate racketeering acts,
                         including but not limited to taking the property of Plaintiff
24                       under circumstances not amounting to a felony, and
                         obtaining possession of property valued at $250 or more
25                       and obtaining a signature by false pretenses, and
                         specifically, NRS 207.360(9) and NRS 207.360(26).

26

27

28  [96] NRS 207.470, NRS 207.400, Allum v. Valley Bank of Nevada, 109 Nev. 280, 849 P.2d 297 (1993).

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

| Compl. ¶ 91 | WMCV has suffered damages by reason of Defendants' violations of the predicate racketeering acts. |
| Compl. ¶ 92 | Defendants' conduct described herein directly and proximately resulted in WMCV suffering damages, the exact amount to be proven at trial. |
| Compl. ¶ 93 | WMCV did not participate in the racketeering violations. |

WMCV has met its burden with respect to pleading the elements of Defendants' RICO violation. However, Defendants argue that "WMCV's entire Nevada state law RICO claim spans approximately on half of a page."[97] Defendants conveniently disregard Paragraph 89 of the Complaint, wherein WMCV "repeats, re-alleges, and incorporates each and every paragraph contained above as though fully set forth herein."

As set forth above, WMCV has properly pled the "who, what, when, where and how" to establish a claim for fraudulent or intentional misrepresentation and/or civil conspiracy. In addition, WMCV's Complaint explicitly identified two "crimes related to racketeering" as such are defined in NRS 207.360, which specifically states in relevant part:

> **NRS 207.360  "Crime related to racketeering" defined.** "Crime related to racketeering" means the commission of, attempt to commit or conspiracy to commit any of the following crimes: . . .
>
> 9.   Taking property from another under circumstances not amounting to robbery; . . .
>
> 26.   Obtaining possession of money or property valued at $250 or more, or obtaining a signature by means of false pretenses; . . .

Defendants' conduct, as alleged in the Complaint, constitutes the taking of WMCV's property under circumstances not amounting to robbery. Further, Defendants have obtained possession of at least $28,200 due to WMCV by false pretenses, and obtained signatures by false pretenses. As such, WMCV has sufficiently pled claims premised upon Nevada's civil RICO statute, NRS 207.470, which are therefore not subject to dismissal.

---

[97] See Defs.' Mot., at 17:8-9.

1

2

### 4.   If WMCV's Claims Are Insufficiently Pled, WMCV Is Entitled To Amend Its Complaint Prior To Dismissal.

3

4        The Supreme Court of Nevada has unequivocally held that: "[a] failure to plead with

5   sufficient particularity does not warrant a dismissal of the action with prejudice."[98]   Stated

6   otherwise, "failure of a plaintiff to comply with NRCP 9(b) . . . only subjects the complaint to a

7   motion for a more definite statement, or at the very worst to dismissal with leave to amend."[99]

8   Accordingly, even if WMCV's Complaint is deficiently pled under NRCP 9(b) – which it is not

9   – the appropriate remedy is to allow WMCV to amend its Complaint.

### B.   WMCV'S CONVERSION CLAIM IS NOT SUBJECT TO DISMISSAL.

10        To prevail on a conversion claim in Nevada, a plaintiff must prove the following

11  elements: (1) the defendant committed a distinct act of dominion wrongfully exerted over

12  plaintiff's personal property; and (2) the act was in denial of, or inconsistent with, plaintiff's title

13  or rights to the property, or the act was in derogation, exclusion, or defiance of plaintiff's title or

14  rights in the personal property.[100]

15

16        ### 1.   WMCV Has Asserted A Viable Conversion Claim As To The $28,200 Converted By Defendants.

17        "The general rule is that monies are intangible and, therefore, not subject to a claim for

18  conversion."[101]   "An exception exists, however, when a plaintiff can allege that the defendant

19  converted specific segregated or identifiable funds."[102]   This statement of law accords with

20

21  ────────────────
    [98] Savage v. Salzmann, 88 Nev. 193, 196, 495 P.2d 367, 368 (1972).

22  [99] Britz v. Consolidated Casinos Corp., 87 Nev. 441, 447, 488 P.2d 911, 916 (1971) (emphasis added) (citing Sax v. Sax, 294 F.2d 133 (5th Cir. 1961)).

23  [100] Evans v. Dean Witter Reynolds, Inc., 116 Nev. 598, 606, 5 P.3d 1043, 1048 (2000).

24  [101] See, e.g., Allied Inv. Corp. v. Jasen, 731 A.2d 957, 966 (Md. 1999) (citing Lawson v. Commonwealth Land Title Ins. Co., 518 A.2d 174, 177 (Md.App. 1986); Limbaugh v. Merrill Lynch, Pierce, Fenner &
25  Smith, Inc., 732 F.2d 859, 862 (11th Cir.1984) (interpreting Alabama law); Pioneer Commercial Funding Corp. v. United Airlines, Inc., 122 B.R. 871, 885 (S.D.N.Y.1991) (interpreting New York law); Warm
26  Springs Properties, Inc. v. Andora Villa, Inc., 526 P.2d 1106, 1108 (Idaho 1974); Sandy Creek Condominium Ass'n v. Stolt & Egner, Inc., 642 N.E.2d 171, 174-75 (Ill.App.3d 1994); Reason v. Payne,
27  793 S.W.2d 471, 474 (Mo.Ct.App.1990)).

28  [102] Id. (emphasis added) (citing Lawson, 518 A.2d at 177;   Mitchell Energy Corp. v. Samson Resources Co., 80 F.3d 976, 984 (5th Cir.1996) (interpreting Texas law); Limbaugh, 732 F.2d at 862; NPF IV, Inc.

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

Defendants' argument that "[w]here there is no obligation to return <u>identical money</u>, but only a relationship of debtor and creditor, an action for conversion of the funds representing the indebtedness will not lie against the debtor."[103]  Conversely, an action for conversion lies where this <u>is</u> an obligation to return <u>identical money</u>.  Further, where a defendant collects money on plaintiff's behalf and thereafter fails to turn those funds over to the plaintiff, a "debtor-creditor" relationship is not established.[104]

"[C]onversion claims generally are 'recognized in connection with funds that have been or should have been segregated for a particular purpose or that have been wrongfully obtained or retained or diverted in an identifiable transaction.'"[105]  "[T]he plaintiff must describe the funds 'with such reasonable certainty that the jury may know what money is meant.'"[106]

Here, S&M, Turner, and/or Birdwell, with Travis' knowledge and authorization or ratification, converted at least $28,200 in monies due to WMCV from Couture and Global Accents.  WMCV has identified those specific funds, which said Defendants were obligated to segregate and immediately pay over to WMCV.  WMCV is entitled to the return of that identical money, and Defendants' conversion cannot be so twisted as to form a debtor-creditor relationship between WMCV and the Defendants.

---

v. Transitional Health Servs., 922 F.Supp. 77, 81 (S.D.Ohio 1996) (interpreting Ohio law); Pioneer Commercial Funding, 122 B.R. at 885; Johnson v. Life Ins. Co., 581 So.2d 438, 442-43 (Ala. 1991); Hudspeth v. A & H Constr., Inc., 495 S.E.2d 322, 323 (Ga.App. 1997); Warm Springs Properties, 526 P.2d at 1108; Sandy Creek Condominium, 642 N.E.2d at 174; Reason, 793 S.W.2d at 474-75; Manufacturers Hanover Trust Co. v. Chemical Bank, 160 A.D.2d 113, 124 (N.Y.S.2d 1990); DeChristofaro v. Machala, 685 A.2d 258, 263 (R.I. 1996); SSI Med. Servs., Inc. v. Cox, 392 S.E.2d 789, 792 (S.C.1990).

[103] See Defs.' Mot., at 18:8-10 (emphasis added) (citing Advanced Enters. Recycling, Inc. v. Bearcaw, 869 A.2d 468, 472 (N.J. Super. Ct. App. Div. 2004),

[104] See U.S. v. Dupee, 569 F.2d 1061, 1064 (9th Cir. 1978) ("Dupee also contends that if he failed to turn over money received for money orders, no embezzlement occurred, but instead a debtor-creditor relationship was established. We disagree. This is a classic case of embezzlement the fraudulent conversion  of the property of another by one who is lawfully in possession of it.")

[105] Allied Inv. Corp., 731 A.2d at 966 (quoting 1 Fowler V. Harper et al., The Law of Torts, § 2.13, at 2:56 (3d ed.1986)); see also 90 C.J.S. Trover and Conversion § 16, Property Subject to Conversion (2010).

[106] Id. (quoting Limbaugh, 732 F.2d at 862).

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

## 2.    <u>Defendants Have Also Converted WMCV's Leases.</u>

The Supreme Court of Nevada has rejected the notion "that personal property must be tangible in order to give rise to a conversion claim."[107]   In <u>M.C. Multi-Family Development, L.L.C. v. Crestdale Associates, Ltd.</u>, 193 P.3d 536 (Nev. 2008), the Supreme Court of Nevada adopted the Ninth Circuit's test for determining whether a property right exists for the purposes of a conversion claim:[108]

> . . . a property right exists when (1) there is an interest capable of precise definition, (2) the interest is capable of exclusive possession or control, and (3) the putative owner has established a legitimate claim to exclusivity.

"[T]he exercise of a right that belongs to another may constitute an act inconsistent with the titleholder's rights and may therefore satisfy the 'wrongful dominion' element of conversion."[109]  Further, "[w]here there is conversion of a document in which intangible rights are merged, the damages include the value of such rights."[110]   Finally, "[o]ne who effectively prevents the exercise of intangible rights of the kind customarily merged in a document is subject to a liability similar to that for conversion, even though the document is not itself converted."[111]

Here, WMCV holds (or held, depending on future rulings from this Court) a clear property right in the form of its leases with Couture and Global Accents.  WMCV's property rights in those leases were clearly and precisely defined by their terms; WMCV's interest in those leases was exclusive; and WMCV's claim to exclusivity is legitimate and established.  Accordingly, the law is clear that the leases between WMCV and Couture, and between WMCV and Global Accents, may form the basis of a conversion claim.

As alleged and further discussed herein, the Defendants' conduct may effectively prevent WMCV's exercise of rights under the aforementioned leases, if the Court deems the fraudulent settlement agreements to be valid and enforceable against WMCV.  Not only may WMCV be

---

[107] <u>M.C. Multi-Family Development, L.L.C. v. Crestdale Associates, Ltd.</u>, 193 P.3d 536, 538 (Nev. 2008).

[108] <u>Id.</u>, at 543.

[109] <u>Id.</u>, at 538.

[110] <u>Id.</u>, at 543 (quoting *Restatement (Second) of Torts* § 242 (1965)).

[111] *Restatement (Second) of Torts* § 242 (1965).

1   precluded from collecting amounts due from Couture and Global Accents as a result thereof, but

2   WMCV further utilizes its leases to collateralize loans related to the real property located at 455

3   South Grand Central Pkwy., in Las Vegas, Nevada.   Should this Court determine that Couture

4   and/or Global Accents' respective leases have been discharged as a result of Defendants'

5   conduct, WMCV will be prevented from using the leases to collateralize its loans.

6          As such, Defendants have wrongfully committed distinct acts of dominion over WMCV's

7   personal property in the form of the leases.   Defendants' conduct was in denial of, inconsistent

8   with, and in defiance of WMCV's rights to the leases.   Accordingly, WMCV's claims for

9   conversion are validly brought, not subject to dismissal.

10

11          **C.     DEFENDANTS INTENTIONALLY INTERFERED WITH WMCV'S
                      CONTRACTS.**

12          WMCV does not contest Defendants' statement of Nevada law concerning a claim for

13   intentional inference with contract, which requires: (1) a valid and existing contract; (2) the

14   defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the

15   contractual relationship; (4) actual disruption of the contract; and (5) resulting damage.[112]  Based

16   upon their reading of the unpublished opinion in <u>Paul Steelman Ltd. v. HKS, Inc.</u>, 2007 WL

17   295610 (D.Nev. 2007), Defendants argue that WMCV cannot demonstrate valid and existing

18   contracts between it, Couture, and Global Accents, because said tenants breached their respective

19   leases prior to Defendants' intentional intereference.   Defendants misconstrue the holding in <u>Paul</u>

20   <u>Steelman, Ltd.</u>, <u>supra</u>.

21          To be sure, the opinion in <u>Paul Steelman, Ltd.</u>, held that "[w]here, as here, the contract

22   has terminated or been breached before the alleged interference occurred, <u>the plaintiff no longer</u>

23   <u>possesses any contractual rights to be violated</u> . . ."[113]   However, WMCV clearly maintained

24   valid and enforceable contractual rights against both Couture and Global Accents when each of

25   them breached their respective leases.   If a contract were to be rendered invalid or non-existent

26

27   [112] <u>J.J. Industries, LLC v. Bennett</u>, 119 Nev. 269, 274, 71 P.3d 1264, 1267 (2003) (citing <u>Sutherland v.</u>
     <u>Gross</u>, 105 Nev. 192, 196, 772 P.2d 1287, 1290 (1989)).

28   [113] <u>Paul Steelman Ltd. v. HKS, Inc.</u>, 2007 WL 295610, at *2 (D.Nev. 2007) (emphasis added).

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

**MARQUIS & AURBACH**
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    by virtue of a parties' breach, no plaintiff would ever have a viable claim based on the contract.

2    Instead, a more careful review of the opinion in <u>Paul Steelman, Ltd.</u>, reveals an all-important

3    factual underpinning which contrasts sharply with the instant case: the at-issue contract in <u>Paul</u>

4    <u>Steelman, Ltd.</u> was <u>terminated</u> prior to the alleged interference.[114]

5         In the instant action, WMCV has accurately alleged that both Couture and Global

6    Accents breached their respective leases.[115]  However, such breaches did not render either lease

7    terminated, invalid, or unenforceable against Couture and Global Accents, and WMCV's

8    Complaint seeks to enforce the terms of each lease.  Despite Couture and Global Accents'

9    breaches, those tenants remain responsible for payment to WMCV of what is contractually due.

10   Defendants' conduct in fabricating false settlement agreements with these tenants without

11   authorization was an intentional act aimed to disrupt WMCV's rights under the leases.  By virtue

12   of this suit, and by virtue of both Couture's and Global Accents' positions that they have been

13   fully released from all obligations, WMCV's contractual rights have been disrupted.  Such

14   disruption has damaged WMCV to the extent of the $28,200 converted by Defendants, to the

15   extent that WMCV may be further precluded from collecting the additional amounts due directly

16   from Couture and Global Accents, and to the extent Defendants' intentional interference

17   adversely affects WMCV ability to collateralize loans.

18        **D.    WMCV'S BREACH OF THE IMPLIED COVENANT OF GOOD FAITH**
19        **AND FAIR DEALING CLAIM AGAINST S&M IS NOT SUBJECT TO**
           **DISMISSAL.**

20        In Nevada, an implied covenant of good faith and fair dealing exists in every contract and

21   essentially forbids arbitrary, unfair acts by one party that disadvantage the other.[116]   As

22   introduced by the Defendants, "[i]n Nevada, a claim for breach of the implied covenant of good

23

24

25   _____

     [114] <u>Id.</u> ("HKS contends that Steelman's tortious interference claim 'is obviously missing one essential
26   element-the valid and existing contract,' because the Architectural Contract had terminated before
     Defendant made any contact with the Owner that could be construed as a disruption of the contract.").

27   [115] <u>See</u> Compl., at ¶¶ 112-131.

28   [116] <u>Frantz v. Johnson</u>, 116 Nev. 455, 999 P.2d 351 (2000).

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

faith and fair dealing exists 'when one party performs a contract in a manner that is unfaithful to the purpose of the contract and the justified expectations of the other party are thus denied.'"[117]

In its Complaint, WMCV has clearly alleged that it retained S&M as it collections agent in 2007, and terminated the relationship on June 25, 2006.[118]  Further, S&M's June 26, 2009, acknowledgement of being "fired" further demonstrates that a contract existed between WMCV and S&M.[119]

In seeking dismissal of WMCV's breach of the implied covenant of good faith and fair dealing claim, however, S&M appears to admit that it did not have a valid and existing contractual right or authorization from WMCV when it unilaterally undertook conduct on WMCV's behalf in drafting and executing the settlement agreements with Couture and Global Accents.  If this is the case, then S&M has admitted that its post June 26, 2009, conduct was unauthorized, and therefore tortious.  However, if S&M intends to argue that it was contractually authorized to enter into the settlement agreements with Couture and Global Accents on WMCV's behalf after June 26, 2009, then WMCV has sufficiently alleged that S&M acted in a manner unfaithful to the purpose of the contract between it and WMCV, and that WMCV's justified expectations were denied.[120]

## E.    WMCV IS ENTITLED TO PURSUE ITS CLAIMS FOR UNJUST ENRICHMENT AGAINST THE DEFENDANTS.

"The essential elements of quasi contract are a benefit conferred on the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance and retention by the

---

[117] See Defs.' Mot., at 20:19-22 (quoting Perry v. Jordon, 111 Nev. 943, 948, 900 P.2d 335, 338 (1995)).

[118] See Compl., at ¶¶ 29, 31, 32.

[119] Id., at ¶¶ 33-34; see also **Exhibit 1**, attached hereto.

[120] While a certain set of facts may support two different causes of action, a plaintiff is entitled to plead both causes of action separately.  Chavez v. Robberson Steel Co., 94 Nev. 597, 584 P.2d 159 (1978) Further, the Supreme Court of Nevada has noted that, "in pleadings, parties may set forth as many inconsistent and alternative claims as they have."  Mallin v. Farmers Ins. Exchange, 108 Nev. 788, 806, 839 P.2d 105, 117 (1992) (interpreting NRCP 8(e)(2)).

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

1  defendant of such benefit under circumstances such that it would be inequitable for him to retain

2  the benefit without payment of the value thereof."[121]

3          As noted hereinabove, in considering whether WMCV's complaint states a claim upon

4  which relief can be granted, all material allegations in the complaint are accepted as true, and are

5  construed in a light most favorable to WMCV.[122]   WMCV has alleged the following in support

6  of its claim for unjust enrichment against the Defendants:

7      Compl. ¶ 139        S&M, Travis, Turner, and Birdwell, and each of them,
                           fabricated both the Alleged Global Accents Release and the
8                          Alleged Couture Release for the purposes of collecting
                           funds due and owing to WMCV directly from Global
9                          Accents and Couture.

10     Compl. ¶ 140        S&M, Travis, Turner, and Birdwell, and each of them, have
                           retained monies they collected from Global Accents and
11                         Couture, but which are due and owing to WMCV.

12     Compl. ¶ 141        The benefit received by S&M, Travis, Turner, and
                           Birdwell, and each of them, through their fabrication of
13                         both the Alleged Global Accents Release and the Alleged
                           Couture Release rightfully belongs to WMCV.
14
       Compl. ¶ 146        As a direct and proximate cause of the Defendants' receipt
15                         and retention of a benefits rightfully belonging to WMCV,
                           WMCV has suffered damages, the exact amount to be
16                         proven at trial.

17  While Defendants may counter that they have not appreciated, recognized or accepted any

18  benefit from their fraudulent conduct in collecting at least $28,200 from WMCV's tenants

19  without any authorization, a ruling on the credibility of the parties or the merits of the case is not

20  appropriate at this stage.   Taking WMCV's allegations as true, its unjust enrichment claims

21  against Travis, Turner, and Birdwell are not subject to dismissal.

22

23

24

25

26

27  [121] Leasepartners Corp. v. Robert L. Brooks Trust, 113 Nev. 747, 755, 942 P.2d 182, 187 (1997) (citing
    Unionamerica Mtg. v. McDonald, 97 Nev. 210, 212, 626 P.2d 1272, 1273 (1981)).

28  [122] Russell, 621 F.2d at 1039

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711  FAX: (702) 382-5816

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

**F.     WMCV SHOULD NOT BE FORECLOSED FROM ASSERTING CLAIMS FOR INJUNCTIVE RELIEF, DECLARATORY RELIEF, SPECIAL DAMAGES, AND PUNITIVE DAMAGES.**

### 1.     Injunctive Relief:

Defendants argue that In re Wal-Mart Wage & Hour Employment Practices Litig., 490 F.Supp.2d 1091 (D.Nev. 2007) requires dismissal of WMCV's claim for injunctive relief. However, a reading of the opinion in that case demonstrates that the Court <u>did not</u> dismiss the injunctive relief claim.  Instead, the Court in In re Wal-Mart simply held:[123]

> Although denominated as a separate claim, count nine is not a separate cause of action but a request for injunctive relief. <u>The Court will not foreclose the remedy of injunctive relief at this stage of the proceedings. The Court therefore will deny Defendants' motion to dismiss count nine with the understanding that count nine is not an independent ground for relief.</u>

Accordingly, this Court should not dismiss WMCV's injunctive relief claim, but instead preserve WMCV's remedy of injunctive relief "with the understanding that count [one] is not an independent ground for relief."

### 2.     Nevada Recognizes A Claim For Declaratory Relief:

Pursuant to NRS 30.040, "[a]ny person . . . whose rights, status or other legal relations are affected by a . . .  contract . . . may have determined any question of construction or validity arising under the . . . contract or franchise and obtain a declaration of rights, status or other legal relations thereunder."  "Actions for declaratory relief are governed by the same liberal pleading standards that are applied in other civil actions."[124]  "The formal sufficiency of a [declaratory relief] claim is governed by NRCP 8(a), which requires only that the claim, 'shall contain (1) a short and plain statement of the claim showing that the pleader is entitled to relief, and (2) a demand for judgment for the relief to which he deems himself entitled.'"[125]

Defendants' reference to Stock West, Inc. v. Confederated Tribes of the Colville Reservation, 873 F.2d 1221 (9th Cir. 1989), is misplaced.  In the context of declaratory relief,

---

[123] In re Wal-Mart Wage & Hour Employment Practices Litig., 490 F.Supp.2d 1091, 1130 (D.Nev. 2007) (emphasis added).

[124] Breliant v. Preferred Equities Corp., 109 Nev. 842, 846, 858 P.2d 1258, 1260-1261 (1993) (citing Squires v. Sierra Nev. Educational Found., 107 Nev. 902, 905, 823 P.2d 256, 257 (1991)).

[125] Id. (citing NRCP 8(a)).

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1   Stock West, Inc. was discussing the usage of the federal "Declaratory Judgment Act," 28 U.S.C.

2   § 2201, for the purposes of jurisdiction, and not NRS 30.040 as interpreted by Nevada case law.

3   As such, Stock West, Inc. is irrelevant.

4      **3.**  **Special Damages:**

5      Defendants do not present any case law to suggest that WMCV has improperly alleged a

6   separate claim for special damages.  In an abundance of caution, WMCV filed a separate claim

7   for special damages.  Notwithstanding, to the extent the Court characterizes special damages as a

8   remedy and not a separate claim for relief, WMCV has separately alleged entitlement to special

9   damages for each of its claims to which such damages would attach.[126]  If this Court is inclined

10  to dismiss WMCV's separate claim for special damages, then WMCV respectfully requests that

11  the Court clarify that WMCV is not foreclosed from recovering special damages.

12     **4.**  **Punitive Damages:**

13     Similarly to its claim for special damages and in an abundance of caution, WMCV has

14  asserted a separate claim for relief for punitive damages.[127]  To the extent the Court characterizes

15  punitive damages as a remedy and not a separate claim for relief, WMCV has separately alleged

16  entitlement to punitive damages for each of its claims to which such damages would attach.[128]  If

17  this Court is inclined to dismiss WMCV's separate claim for punitive damages, then WMCV

18  respectfully requests that the Court clarify that WMCV is not foreclosed from recovering

19  punitive damages where appropriate.

20  **VI.** **CONCLUSION.**

21     As set forth herein, specific personal jurisdiction exists over each of the Defendants, who

22  should be required to appear before this Court and answer for their wrongful conduct.  However,

23  even if the Court disagrees, then WMCV is entitled to conduct jurisdictional discovery prior to

24  dismissal.  Further, WMCV has pled – with the particularity required of each claim for relief –

25  the facts necessary to sustain each and every cause of action alleged against Defendants S&M,

26  
27  [126] See Compl., at ¶¶ 67, 79, 88, 95, 103, 111, 137, 147, 154, 160.

[127] Id., at ¶¶ 157-160.

28  [128] See Compl., at ¶¶ 78, 87, 102, 110.

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

Travis, Turner, and Birdwell.  Accordingly, Defendants' motion should be denied, in its entirety. To the extent WMCV's claims for relief may be better characterized as remedies, the Court should not foreclose WMCV from pursuing those remedies even if dismissal of the claim(s) is technically appropriate.

Dated this 18th day of June, 2010.

MARQUIS & AURBACH

By  /s/ Craig F. Robinson, Esq.
   Terry A. Coffing, Esq.
   Nevada Bar No. 4949
   Craig F. Robinson, Esq.
   Nevada Bar No. 10205
   10001 Park Run Drive
   Las Vegas, Nevada  89145
   Attorneys for Plaintiff

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

**MARQUIS & AURBACH**
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

**CERTIFICATE OF SERVICE**

In accordance with Fed. R. Civ. P. 5, I hereby certify that on the 18th day of June, 2010, I served a copy of the foregoing **OPPOSITION TO DEFENDANTS SHUSHOK & MCCOY INC.'S; MATTHEW J. TRAVIS'; MATT TURNER'S; AND RICHARD BIRDWELL'S MOTION AND SUPPORTING MEMORANDUM TO DISMISS THE COMPLAINT** upon each of the parties via CM-ECF filing:

Joshua M. Dickey, Esq.
Brandon P. Kemble, Esq.
BAILEY KENNEDY
8984 Spanish Ridge Avenue
Las Vegas, Nevada 89148
Attorneys for Defendants Shushok & McCoy, Inc.;
Matthew J. Travis; Matt Turner; and Richard Birdwell

Gary E. Schnitzer, Esq.
Michael D. Lee, Esq.
KRAVITZ, SCHNITZER, SLOANE & JOHNSON, CHTD.
8985 S. Eastern Avenue, Suite 200
Las Vegas, Nevada 89123
Attorneys for Defendant Global Accents, Inc.


 /s/ Susie Ryan
An employee of Marquis & Aurbach

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

M&A:11320-004 1071101_1 6/18/2010 10:43 AM

# EXHIBIT "1"

# EXHIBIT "1"

## Kerrie Kramer

| | |
|---|---|
| **From:** | Matt Travis [mtravis@ssmccoy.com] |
| **Sent:** | Friday, June 26, 2009 10:04 AM |
| **To:** | ntorres@ssmccoy.com; Esmeralda Dominguez |
| **Cc:** | Jonathan Leleu; Kerrie Kramer; Katherine Venezia |
| **Subject:** | RE: |

This is a joke right?

You guys set yourself up for failure. Please watch CNBC in late August as Fred Thompson and I discuss protocol for people like yourselves. These debtors don't need you any more after the first go round and you are void of leverage. I could have 50% (750k) of all placement dollars returned to your organization, this is settlement paper.  Furthermore 30% of the claims you sent were out of business when you sent them which inherently proves your staff has no idea what is or is not collectable.  Esmeralda needs a math lesson...  We work on a contingent basis so it's absurd to claim we get commission without collection. We are top ten, you are subpar and uneducated about this process.  I assume this why you place out of business accounts and expect results (Esmeralda). If your paper is so good Leleu should have no problem filing suit and getting paid. Oh wait, they're OOB. Please waste someone else's time. And yes we fired you months ago with good reason.  We circumvented Esmeralda to get a response, don't you think that applies to how we collect?  Exactly.  I guess Gaylord Hotels uses our service because they detest results.

MT.

**From:** Nino Torres [mailto:ntorres@ssmccoy.com]
**Sent:** Friday, June 26, 2009 11:18 AM
**To:** 'Esmeralda Dominguez'
**Cc:** 'Jonathan Leleu'; 'Kerrie Kramer'; 'Katherine Venezia'
**Subject:** RE:

Ms. Venezia,

In the last couple of days I have reached out to you in efforts to ask for your support in trying develop better working relationships between Shushok and McCoy and World Market.  I was assigned your account in December of 2008 and before me, your organization was working with Aaron Birdwell in our office.  He is now the director of our collections dept. It is my understanding that World Market came looking for us- a collection service with a solid history in getting clients paid because your current process was not working.  The same process that has brought us to this impasse.

In summary,  since 2007 you have turned over 64 accounts to us, we have collected on 6, three for balance in full, and three for settlements this is an 11% yield with your company.  Our company's overall yield last year, not including your company is 82%.

Our success is attributed to hard work, perseverance and an acute understanding of the collection process and we always foster a team approach with our clients.  We did not become one of Forbes Magazine Top Ten Collection Professionals in the Nation in 2009 by 'accepting paltry settlements' as Esmeralda would have you believe.

I contacted you out of frustration in trying to move forward with your company through Jonathan and Esmeralda.  In the last two weeks, I have made several attempts to contact them.  I went as far as making an appointment with them and then took valuable time out of my day to put together a review.  I sent the review ahead of time for their benefit and waited and waited, two days went by before I even got a call back explaining why the meeting never took place.  This lack of professionalism has been common with my World Market call point and has compounded efforts to collect on your accounts.

With regards to your World Market accounts,  the process that you have in place or I should say lack of processes is counter productive to any collection efforts by any collection company.  Your company evicts tenants long after they have gone making it infinitely difficult to firstly find them, secondly to collect on a bill that is often more that 6 months old.  On

top of this, there is no incentive for your tenants to work towards clearing this debt because of the barriers that you have put up against them trying to get back in to your facility. I am referring to all of the additional fees that they must pay to regain their spot. You obviously do not want them back in, and so they feel like its a hopeless cause. Additionally, you must know that your tenants set up as LLC's for a reason. A threat of getting sued is a total waste of time and effort.
I have approached Esmeralda on more that one occasion as well as J.L. to come together and develop some policies and procedures where by we could collectively go after these debtors with maximum efforts. This too has been disregarded by both of your employees.

Lastly, let me defend my company against Esmeralda's statement-"Call efforts have not been aggressive and, over the last several months, your insistence we accept paltry settlements made clear Shushok is only looking to earn commission and has no interest in collecting our accounts."

Quite honestly, Esmeralda does not know much about our efforts to collect because she does not return my calls and has very few questions regarding the specifics of the accounts. In the review I prepared, which I have attached for your review, I have cut and pasted call notes of two of your debtors showing you the level of depth and work we have put into the accounts. As you can see, some of these notes are pages and pages long. Often times we do the due diligence knowing full well that the accounts will never pay. Through our hard work we have gone as far as to identify and produce a paper trail of illegal practices by your tenant against your company. And when we presented this evidence to your legal it too fell on deaf ears. Esmeralda once again contradicts herself when she claims that we are 'only looking to earn a commission and have no interest in collecting our accounts.' Honestly....we work on contingency!! We do not get paid unless we collect, in translation the only way we earn commission is if we collect on your accounts.

Ms. Venezia, before coming to work for Shushok and McCoy I spent 20 years of my career with Fortune 100 and 500 companies. I have worked as a buyer at a desk managing millions in inventory, I was a Sr. Forecasting Analyst for a national consumer packaged goods company and have managed a sales territory with over $100 million in sales. I am fully aware of the implications of circumventing a company's chain of communication/command. However; I too have a boss and company mandated goals to answer to. I gave your employees more than ample time to respond to my requests on several occasions.

I tried to appeal to your P&L side of the business. Just think that if we had collected on 50% of all of your accounts, how much money you would have gotten. And that is not an unrealistic number given our trend. Instead, we are wasting our time with he said/ she said. You are a sales company, surely recouping anything we can get from these deadbeats is plus plus profits for you. If we were allowed to do our job, we would have gotten you paid by now. I am not accustomed to allowing legal staff to run and make decisions on a profit entity of a company.

So now you are firing us. Well let me tell you, we did nothing wrong. We worked our butts off for your company for very small returns. Your red tape and bureaucratic approach has rendered our relationship to this. According to Leleu you have been experiencing phenomenal responses to your shows and are turning business away. That could possibly explain why you have no interest in working with your debtors but I have learned that industry circles run small and I can tell you that your practices are not going unnoticed by our constituents. Constituents that you may one day find that you need support from and in this economy I feel we should all come together and help one another through these toughest of times. I do not feel that your company is fostering such an approach.

I welcome any comments or questions from you regarding any aspect of our involvement with your organization and look forward to hearing from you the final word on this matter.

Best Regards,

**Nino Torres- Client Services Manager**
**SHUSHOK AND McCOY INC.**
ntorres@shushok-mccoy.com
**ph- 817-865-1372**
**fx-817-865-1218**



cc: MTravis, ABridwell, MTurner

---

**From:** Esmeralda Dominguez [mailto:Esmeralda.Dominguez@lasvegasmarket.com]
**Sent:** Thursday, June 25, 2009 5:47 PM
**To:** ntorres@ssmccoy.com
**Cc:** Jonathan Leleu; Kerrie Kramer; Katherine Venezia
**Subject:**
**Importance:** High

Nino,

I apologize I was unavailable to speak with you today. We are disappointed.  Neither Jonathan, nor I, nor Kathy appreciate your effort to circumvent our processes – calling Kathy after we expressly told you we would contact you with further information is unacceptable. With respect to the two accounts you asked about; Global Accents was pulled from Shushok in March. You have no authority to proceed with collection on this file.  With respect to Couture International, the settlement amount is grossly insufficient – we will not settle for half. Effective immediately, Shushok should cease collection efforts on all World Market Center files. Call efforts have not been aggressive and, over the last several months, your insistence we accept paltry settlements made clear Shushok is only looking to earn commission and has no interest in collecting our accounts.

Please consider this email to be Shushok and McCoy's termination of all accounts at World Market Center.

Esmeralda Dominguez | Collections Manager
p: +1 (702) 599-3008
www.lasvegasmarket.com

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this e-mail by mistake, please notify the sender immediately and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of the information contained herein is strictly prohibited. Any views or opinions presented in this email are solely those of the author and do not necessarily represent those of World Market Center Las Vegas.

   **Please consider the environment before printing this email.**