1  **FOFCOL**
   MICHAEL B. LEE, ESQ.
2  Nevada State Bar No. 10122
   MICHAEL B. LEE, P.C.
3  2000 S. Eastern Avenue
   Las Vegas, Nevada 89104
4  Telephone:    (702) 477.7030
   Facsimile:    (702) 477.0096
5  Attorneys for Defendant Global Accents

6              **IN THE UNITED STATES DISTRICT COURT**

7                     **DISTRICT OF NEVADA**

8  WMCV PHASE 3, LLC, a Delaware limited
   liability company,                              Case No.:      2:10-cv-00661-RCJ-RJJ
9
                            Plaintiff,
10                                                 **GLOBAL ACCENTS' SECOND**
                                                   **PROPOSED FINDING OF FACTS,**
11 vs.                                             **CONCLUSIONS OF LAW**

12 SHUSHOK & MCCOY, INC., a Texas
   corporation; MATTHEW J. TRAVIS, an
13 individual; MATT TURNER, an individual;
   RICHARD    BIRDWELL,    an   individual;
   GLOBAL ACCENTS, INC., a California
14 corporation; COUTURE INTERNATIONAL,
   INC., a Quebec corporation; DOES I through
15 X, inclusive; ROE ENTITIES I through X,
   inclusive,
16
                            Defendants.
17

18        Presently before this Honorable Court is Plaintiff's WMCV PHASE 3, LLC. ("Plaintiff,"

19 "WMCV," or "World Market Center") action against Defendants GLOBAL ACCENTS, INC.

20 ("Global Accents"), SHUSHOK & MCCOY, INC. ("Shushok"), MATTHEW J. TRAVIS

21 ("Travis"), MATT TURNER ("Turner"),[1] RICHARD BIRDWELL ("Birdwell") ("Shushok,"

22 "Travis," and "Birdwell" are collectively referred to as "Shushok Defendants"), and COUTURE

23 INTERNATIONAL, INC. ("Couture")[2].  On June 11, 2012, this Honorable Court conducted a

24 non-jury trial to determine whether the Global Accents should be liable to WMCV for breaches

25 arising from a breach of lease and related claims, or whether Global Accents had reasonable

26 _____

27 [1]    Mr. Travis filed a petition for Chapter 13 bankruptcy in Texas; therefore, this action is not proceeding
        against Turner.

28 [2]    WMCV settled with Couture before the trial.

MICHAEL B. LEE, P.C.
2000 SO. EASTERN AVENUE
LAS VEGAS, NEVADA 89104
TEL – (702) 477.7030; FAX – (702) 477.0096

objective and subjective belief that the Shushok Defendants had apparent authority to negotiate a settlement and/or lease termination agreement with Global Accents on behalf of WMCV.  After hearing multiple witnesses, reviewing numerous documents, and entertaining other forms of evidence, this Court finds judgment in favor of, and against Plaintiff, Global Accents on all counts.  Furthermore, it also finds in favor Global Accents' counterclaims against Plaintiff.[3]

The following findings of fact and conclusions of law supports this Judgment.  The Parties agreed, by way of the Pre-Trial Order, to initial facts related to Global Accents' lease of real property and subsequent eviction, WMCV's retention of Shushok, and the assignment of the Global Accents collection matter to Shushok.  After hearing from several witnesses and examining the evidence, this Honorable Court has made additional findings of fact.

## FINDINGS OF FACT

### *The Parties*

1.      WMCV owns real property located at 455 S. Grand Central Parkway in Las Vegas, Nevada (the "Property").  Jack Kashani ("Kashani") is a Co-Manager of WMCV and involved in the original development of the Property.  As a Co-Manager of WMCV, Mr. Kashani would receive weekly reports regarding tenants in default, amounts owed, and the collection efforts/status.  Kashani would sign all leases for tenancies at the World Market Center Las Vegas.

2.      WMCV utilizes the trade name "World Market Center Las Vegas" as its brand after reaching an agreement with Cost Plus Management Services, the parent company of World Market and Cost Plus World Market Brand.  "World Market Center" and "World Market Center Las Vegas" appear on communications from WMCV's employees by way of signature blocks and logos.

3.      Global Accents is a California corporation involved in the floor covering business.  It has been in operation since 2002 and is still an active corporation, although it does not currently do business.  Parham Partielli aka Danny Partielli ("Partielli") is the President of

---

[3]      Global voluntarily dismissed the claim for deceptive trade practices NRS 598.0915.

MICHAEL B. LEE, P.C.
2000 SO. EASTERN AVENUE
LAS VEGAS, NEVADA 89104
TEL. – (702) 477.7030; FAX – (702) 477.0096

1    Global Accents.

2        4.      Mr. Kashani and Mr. Partielli knew each other since the early 1970's.   Mr.

3    Kashani was friend of Mr. Partielli's family, and had operated a ranch in California sometime in

4    the 1970's that Mr. Partielli's father was a shareholder in.  Mr. Partielli was acquainted with Mr.

5    Kashani's wife and his wife's brothers, along with Mr. Kashani's sister.  Mr. Kashani described

6    Mr. Partielli as a close friend of his and as a very honorable person.  Trial Exhibit 533 at GLOB

7    161.  Mr. Partielli viewed Mr. Kashani as a trusted and respected person based on the long

8    history of their relationship and family association.

9        5.      WMCV hired Shushok as a commercial collection agent for the purposes of

10   recovering and settling past due amounts from files WMCV.  WMCV's policy was to refer any

11   account past due and/or in eviction and/or with eviction completed to Shushok for negotiation,

12   settlement, and collection.  However, unbeknownst to Global Accents, Shushok had no actual

13   authority to enter into written agreements with tenants on behalf of WMCV.  Esmeralda

14   Dominguez ("Dominguez"), the Collection Manager for and employee of WMCV, would work

15   with the Shushok Defendants on the assignment of and overseeing collection matters.  In general,

16   after initial contact with a defaulting/evicted tenant by way of letter, WMCV would refer the

17   tenant to Ms. Dominguez.  Thereafter, Ms. Dominquez would refer the tenant to Shushok, and

18   advise that the tenant needed to negotiate with it to resolve the debt issue, and settle the debt

19   through and with Shushok.  Shushok had authority from WMCV to engage in negotiations with

20   assigned tenants, which could include discussions with legal representatives, as part of the

21   collection process, and reach a settlement with such parties.

22       6.      During the time that WMCV retained Shushok, Shushok had negotiated and

23   entered into at least three settlement agreements with three separate companies.  WMCV had not

24   provided any notice to any of the parties who had entered into these agreements until after they

25   had entered into and funded these agreements.

26                                    *The Global Accents Lease*

27       7.      Prior to the construction of the Property, Mr. Kashani would see Mr. Partielli at

28   tradeshows in High Point, North Carolina prior to 2006.  He would inform Mr. Partielli about the

MICHAEL B. LEE, P.C.
2000 SO. EASTERN AVENUE
LAS VEGAS, NEVADA 89104
TEL – (702) 477.7030; FAX – (702) 477.0096

MICHAEL B. LEE, P.C.
2000 SO. EASTERN AVENUE
LAS VEGAS, NEVADA 89104
TEL – (702) 477.7030; FAX – (702) 477.0096

construction of the Property, and encourage him to lease space there stating that he would help him find a great showroom located with the floor covering merchants.  From these conversations, Mr. Partielli understood that Mr. Kashani was an authority figure for the World Market Center.

8.    At first, Global Accents would lease space from Plaintiff on a temporary basis for a seasonal show that would last approximately five to seven days.  During these shows, Mr. Kashani would visit Mr. Partielli and solicit him to lease space on a permanent basis.  Eventually, Mr. Partielli, on behalf of Global Accents, agreed.

9.    On August 7, 2006, Plaintiff's predecessor-in-interest, WMC I Associates, LLC, as landlord, entered into a lease agreement ("the Global Accents Lease") with Global Accents, as tenant, for space known as C-875 in the Property to commence on July 1, 2008.  However, this was prior to the construction of the commercial space.

10.   On or about December 21, 2006, WMC I Associates, LLC assigned the Global Accents Lease to WMCV.

11.   On April 2, 2007, Global Accents, as tenant, and WMCV, as landlord, executed the First Amendment to the Global Accents Lease (the Global Accents Lease collectively with the First Amendment shall be hereinafter referred to as the "Amended Global Accents Lease"), which changed the space Global Accents leased from the 8th floor in space C-875 of the Property to the 7th floor in space C-775 of the Property (the "Global Accents Premises").  Trial Exhibit No. 2.  Notably, the document is labeled, "WORLD MARKET CENTER LAS VEGAS TOWER III / FIRST AMENDMENT TO LEASE AGREEMENT" and was signed by Mr. Kashani.  *Id.*  WMCV had represented to Mr. Partielli that rug vendors would be located in the vicinity of C-775 space of Global Accents.

12.   Sometime in July, Global Accents showed at the summer show at the Property, paying approximately $4000 to $4,466 in rent and $4,200 as a security deposit.  However, it found that the new space was much smaller than WMCV promised, which compromised its ability to display its products.  Further problematic, it was located away from other floor-covering vendors, which decreased the amount of foot traffic exposure Global Accents would have from potential buyers. _Further, there were many vacant spaces and many spaces with

**MICHAEL B. LEE, P.C.**
2000 SO. EASTERN AVENUE
LAS VEGAS, NEVADA 89104
TEL – (702) 477.7030; FAX – (702) 477.0096

window display only surrounding Global Accents' space that made the location "dead space." Thus, after the first show, Global Accents vacated the space and tendered the keys to Julie Schwartz ("Schwartz"), WMCV's Director of Leasing, Home Accessories.   Mr. Partielli attempted to resolve the space issue with Ms. Schwartz by way of attempting to find a suitable replacement space, but never reached a resolution.

13.     On or about August 1, 2008, Global Accents failed to pay rent, despite several requests, noting that the subject space was already vacated and the keys and the space tendered to Schwartz.

14.     On or about November 20, 2008, Robert Maricich ("Maricich"), WMCV's President and CEO, sent a letter to Global Accents advising of the delinquency and requesting it to contact Ms. Dominguez by telephone to discuss the delinquency.   Trial Exhibit 530.   Mr. Maricich's signature block on his letter denoted "World Market Center Las Vegas."  *Id.*

15.     WMCV evicted Global Accents on or about December 30, 2008.   Trial Exhibit No. 2.   The landlord on the eviction notice is identified as "WMCV PHASE 3, LLC dba World Market Center Las Vegas."  *Id.*  Global Accents never received any notice of such eviction until the eviction was completed.

16.     On or about January 6, 2009, Julia Jesinger ("Jesinger"), the Tenant Affairs Manager for WMCV, sent an e-mail to Mr. Partielli, the President of Global Accents, notice and order for summary eviction.   Trial Exhibit 17.   Notably, Ms. Jesinger's signature block included the name "World Market Center Las Vegas" as the company she worked for.  *Id.*  On the same day, Ms. Jesinger sent Global Accents a fax with notice to remove its property from the Premises.  *Id.*  Mr. Partielli replied that the space had been vacated and tendered to WMCV with its keys at the end of the first show when Global Accents occupied C-775.

17.     The total remaining value of the Global Accents Lease at the time of Global Accents' eviction was $360,831.00; since evicting Global Accents, WMCV has been unable to re-lease C-775.

/ / / /

/ / / /

MICHAEL B. LEE, P.C.
2000 SO. EASTERN AVENUE
LAS VEGAS, NEVADA 89104
TEL – (702) 477.7030; FAX – (702) 477.0096

*Shushok's Attempted Collection of Global Accents Account*

18.     In mid-to-late January, 2009, Mr. Partielli, on behalf of Global Accents, contacted Ms. Dominguez [4] to discuss resolving and settling any Global Accents debt to WMCV and to discuss leasing a suitable space at WMCV.  However, Ms. Dominguez informed Mr. Partielli that she could not speak with him about the eviction issue, or any debt of Global Accents to WMCV, and represented to Mr. Partielli, on behalf of WMCV, that the Global Accents debt and all matters relating to any amounts owed from Global Accents to WMCV has been referred and assigned to Shushok for collection and settlement,  that only Shushok could discuss and settle any Global Accents debt to WMCV, and  that Shushok had full and final authority for WMCV to resolve any debt of Global Accents to WMCV.  She instructed Mr. Partielli to discuss, negotiate, and settle any Global Accents debt with Shushok only and to pay Shushok upon reaching resolution.  She further told Mr. Partielli that after Mr. Partielli resolved the past debt with Shushok, he could contact WMCV to lease new space.  From this conversation, Mr. Partielli understood that Shushok had full and final authority to discuss, negotiate, settle and receive payment for any debt of Global Accents to WMCV and settle any Global Accents debt to WMCV and enter into a release agreement with Global Accents on behalf of WMCV.

19.     Shortly thereafter, Mr. Partielli received a phone call from Aaron/Richard Birdwell ("Birdwell") who informed Mr. Partielli that he had full and final authority for WMCV to discuss, negotiate, resolve, and settle any debt of Global Accents to WMCV on behalf of WMCV.[5]  Around January 19, 2009, Mr. Birdwell sent an e-mail to Mr. Partielli that requested a settlement of $28,114.73[6] to settle the lease dispute with mutual releases for both WMCV and

---

[4]     Ms. Dominguez did not appear as a witness in this matter.  The only person with personal knowledge of conversations with between her and Mr. Partielli was Mr. Partielli.  No evidence at trial contradicted Mr. Partielli's testimony regarding these conversations.

[5]     The Parties designated portions of Mr. Birdwell's deposition transcript as Trial Exhibits 32 and 33.  However, the only evidence regarding statements from Mr. Birdwell to Mr. Partielli related to Shushok's authority was based on Mr. Partielli's testimony.  No evidence at trial contradicted Mr. Partielli's testimony regarding these conversations.

[6]     Despite the $360,831.00 in unpaid past and future rent, the negotiations for settlement involved the unpaid rent only.  No evidence appears that Global Accents, Shushok, or WMCV ever negotiated against the $360,831.00 figure.

Global Accents. Trial Exhibit 19. In response, Mr. Partielli explained that Global Accents had only occupied the space for five day, which it had paid for, and noted the other issues with the square footage, surrounding vacancies, and lack of proximity to other floor-covering vendors. Additionally, he also explained that Global Accents had already paid for the space during the time it actually possessed the area and tendered the key back to WMCV at the end of the first show by Global Accents.

20.     On or about February 2, 2009, Mr. Partielli contacted Mr. Birdwell to meet at the Property during the upcoming winter tradeshow so that Mr. Partielli could demonstrate in person to Mr. Birdwell the issues with the space mentioned and to measure the prior showroom with Mr. Birdwell, and to discuss issues with the Amended Global Accents Lease. Joint Exhibit 21. However, Mr. Birdwell indicated that he was not attending, and that Mr. Partielli would need to contact Ms. Dominguez to meet her while Mr. Partielli would be in Las Vegas to speak about those issues. *Id.* Thereafter, Mr. Partielli contacted Ms. Dominguez requesting to meet her in person while Mr. Partielli would be in Las Vegas, but she referred him back to Shushok to resolve the lease dispute and any debt owed by Global Accents to WMCV. Once again, Ms. Dominguez specified that the Shushok Defendants had full and final authority for WMCV to discuss, negotiate, settle, and receive payment for any debt of Global Accents to WMCV, and he would have to negotiate exclusive with them. This lead Mr. Partielli to believe that Shushok had full and final authority to discuss, negotiate, settle and receive payment for any debt of Global Accents to WMCV including negotiating release agreements. Ms. Dominguez represented to Mr. Partielli that once he resolved the debt issue with Shushok, WMCV would discuss leasing new space to Global Accents. Based on that conversation, Mr. Partielli understood that Shushok had complete authority on behalf of WMCV to discuss, negotiate, settle, and receive payment for any debt of Global Accents to WMCV and to negotiate the lease dispute.

21.     Sometime in March 2009, WMCV removed the Global Accents account from Shushok. Joint Exhibit 23. WMCV never notified Global Accents of this action. Shushok never informed Global Accents that the Global Accents account was removed from Shushok by

MICHAEL B. LEE, P.C.
2000 SO. EASTERN AVENUE
LAS VEGAS, NEVADA 89104
TEL – (702) 477.7030; FAX – (702) 477.0096

**MICHAEL B. LEE, P.C.**
2000 SO. EASTERN AVENUE
LAS VEGAS, NEVADA 89104
TEL – (702) 477.7030; FAX – (702) 477.0096

WMCV.  Similarly, Global Accents never received any notice from any successor collection agents for WMCV that any Global Accents debt to WMCV had been assigned to such successor collection agents.  Global Accents had no knowledge or notice otherwise that Shushok had been terminated by WMCV as the collection agent for WMCV to negotiate, settle, and receive payment for any debt of Global Accents to WMCV until months after settlement was reached on the debt of Global Accents to WMCV.

22.	On or about May 11, 2009, Mr. Partielli, on behalf of Global Accents, communicated with Mr. Birdwell to present a settlement offer.  Trial Exhibit 22.  As WMCV's summer tradeshow was approaching, Global Accents was interested in presenting there.  As such, Mr. Partielli offered to either (1) maintain the security deposit plus Global Accents' payment of two months of rent or (2) Global Accents payment of $28,000 less security deposit and the ability to present at another show at no additional rental cost.  *Id.*  The overall goal was to pay approximately $8,200.00 after the offsets.  As before, Mr. Partielli noted the issues with the Amended Global Accents lease.  *Id.*  Mr. Birdwell contacted Ms. Dominguez and relayed the offer.  Joint Exhibit 33 at p. 3 lls. 44:4-22.

23.	On June 25, 2009, WMCV terminated Shushok's authority to conduct commercial collections and recover past due debt and rent from tenants of the Property by way of e-mail.  Joint Exhibit 23.  Notably, WMCV was aware that the Shushok Defendants had continued to work on the Global Accents account despite the removal of the file back in March.  *Id.*  Once again, WMCV never informed Global Accents that it had terminated Shushok as its collection agent.

24.	Sometime thereafter, WMCV retained a new collection agency and assigned the Global Accents account to them.  However, neither the new collection agency nor WMCV notified Global Accents that WMCV had reassigned its file to a new collection agency.  Similarly, neither WMCV nor the new collection agency informed Global Accents that WMCV had terminated Shushok.

25.	Shushok never communicated to Global Accents that it did not have authority from WMCV to continue with collection efforts with Global Accents.

**MICHAEL B. LEE, P.C.**
2000 SO. EASTERN AVENUE
LAS VEGAS, NEVADA 89104
TEL – (702) 477.7030; FAX – (702) 477.0096

26.     Mr. Birdwell was not WMCV's employee of any sort, and according to WMCV, neither he nor Shushok were authorized to enter into any agreement on behalf of WMCV. However, this information was never communicated to Global Accents.  To the contrary, Ms. Dominguez consistently told Mr. Partielli that Shushok had full and final authority for WMCV to negotiate the settlement, and all communications had to flow through the Shushok Defendants, and that Shushok only could discuss, negotiate, and settle any Global Accents debt to WMCV and to receive payment upon reaching resolution.

27.     Sometime in late July, early August, 2009, Mr. Partielli received an offer from Shushok to resolve the Global Accents Lease dispute for $8,200.00 to settle any debts owed by Global Accents to WMCV.

28.     Prior to responding to this offer, Mr. Partielli, on behalf of Global Accents, contacted Mr. Kashani regarding the negotiation and settlement.  Ex. 534.  Prior to this contact, Mr. Kashani received weekly reports regarding defaulting tenants, which included the collection efforts against Global Accents.  Thus, Mr. Kashani had either actual or constructive knowledge regarding the collection efforts against Global Accents.  During that conversation, Mr. Partielli told Mr. Kashani that Global Accents had recently received an offer from Shushok to settle any debts of Global Accents to WMCV for $8,200.  However, Mr. Partielli explained that he did not think the settlement was fair because the Amended Global Lease did not meet his expectations based upon what was represented to him.  *Id.*  Mr. Partielli asked Mr. Kashani if he could help him reduce the settlement or eliminate the dispute.  *Id.*  In response, Mr. Kashani informed Mr. Partielli that it was a good deal and for Global Accents to go forward with it since WMCV generally pursued all claims in full.  *Id.*  Mr. Kashani also informed Mr. Partielli that once the proposed settlement was done and Global Accents had paid the $8,200.00 settlement, Mr. Kashani would put him in contact with a leasing agent to obtain new space.

29.     After this conversation with Mr. Kashani, Mr. Partielli believed that Shushok had full, complete, and final authority for WMCV to settle any debt of Global Accents with WMCV and to enter into and negotiate a lease termination and release agreement on behalf of WMCV with Global Accents.  The term of the settlement was consistent with the prior settlement offer

MICHAEL B. LEE, P.C.
2000 SO. EASTERN AVENUE
LAS VEGAS, NEVADA 89104
TEL – (702) 477.7030; FAX – (702) 477.0096

that Mr. Partielli had made in May, and represented two months of rent.  In turn, after the conversation with Mr. Kashani, Mr. Partielli contacted the Shushok Defendants and agreed to the settlement of any and all Global Accents debt to WMCV for $8,200.00.  Global Accents wire transferred and paid such $8,200.00 within a few days after Mr. Partielli's conversation with Mr. Kashani and Mr. Kashani's advice to go forward with the settlement.  This settlement payment was made to Shushok on behalf of WMCV according to the payment instructions received by Global Accents from Shushok.

30.     On August 26, 2009, Mr. Partielli, on behalf of Global Accents signed a Lease Termination and Release Agreement (hereinafter the "Global Accents Release") which: (1) Global Accents received from Shushok; (2) Matthew Turner, a principal and collection agent for Shushok, signed as a "Director" on behalf of World Market Center Las Vegas, Inc.; and (3) releasing Global Accents from its liability under the Amended Global Accents Lease in exchange for $8,200 to be paid directly to WMCV.  Joint Exhibit 26.  Mr. Partielli believed that WMCV had drafted the Global Accents Release, approved it, and transmitted it to Shushok to finalize with Mr. Partielli's signature.  He also understood that it was non-negotiable, and that he could not change any of the terms.

31.     The terms of the Global Accents Release specified that:

2.  Termination of Lease.  As of the Termination Date, all parties to the Lease are fully and unconditionally released and discharged ((except as otherwise set out in this Agreement) from their respective obligations to perform each of the terms, covenants, and conditions set in the Lease and arising after the Termination Date.

5.  Mutual Release . . . Landlord and Tenant hereby release and forever discharge each other, and their respective partners, officers, directors, agents, trustees, beneficiaries, and employees, of and from any and all claims, acts, damages, demands, rights of action, and causes of action which each party ever had, now has, or in the future may have, against the other, arising from, under or in any way connected with the Lease.
6.   Compromise. . . This Agreement is made entirely as a compromise and for the purpose of terminating the Lease and settling and extinguishing the respective claims, acts, damages, demands, rights of action, or causes of action of the parties hereto, expect as otherwise stated or reserved hereunder.

*Id.*

MICHAEL B. LEE, P.C.
2000 SO. EASTERN AVENUE
LAS VEGAS, NEVADA 89104
TEL – (702) 477.7030; FAX – (702) 477.0096

32.     Global Accents paid $8,200 directly to Shushok after Global Accents executed the Global Accents Release by way of a wire transmission.  Joint Exhibits 24, 27.

33.     After finalizing the Global Accents Release, sometime in late 2009, Mr. Partielli contacted WMCV regarding leasing new space.  Trial Exhibit 533 at Glob 163.  However, WMCV informed him Shushok did not have authority to enter into the Global Accents Release. *Id.*  This was the first time that Global Accents received notice that Shushok did not have authority to enter into negotiations for the Global Accents Release.  Mr. Partielli explained that Shushok negotiated the deal, and Mr. Kashani had advised him to proceed with it, so he was surprised that the debt was still open.  *Id.* at Glob 161.  Nevertheless, WMCV denied that there was a settlement and initiated this lawsuit.  Mr. Partielli's conduct after the settlement, specifically contacting WMCV for leasing new space, was in conformity with discussions of Mr. Partielli with Mr. Kashani and Ms. Dominguez to contact WMCV for leasing new space after settlement Global Accents debt to WMCV through Shushok, and was initiated voluntarily by Mr. Partielli.

34.     WMCV filed the following claims against the Shushok Defendants: injunctive relief; civil conspiracy; civil RICO (against Shushok only); conversion; intentional interference with contracts; declaratory relief; special damages for attorney fees; and punitive damages.  Default has previously been entered against the Shushok Defendants for various reasons.

35.     WMCV filed the following claims against Global Accents: fraud; civil conspiracy; breach of lease; breach of implied covenant of good faith and fair dealing; unjust enrichment; declaratory relief; special damages for attorney fees; and punitive damages.  However, Plaintiff voluntarily dismissed the fraud and civil conspiracy claims against Global Accents.

36.     Global Accents filed the following counterclaims against WMCV: breach of contract; breach of the covenant of good faith and fair dealing; deceptive trade practices NRS 598.0915; and declaratory relief.  However, Global Accents voluntarily dismissed the deceptive trade practices NRS 598.0915 claim.

/ / / /

MICHAEL B. LEE, P.C.
2000 SO. EASTERN AVENUE
LAS VEGAS, NEVADA 89104
TEL – (702) 477.7030; FAX – (702) 477.0096

37.     Global Accents filed the following crossclaims against the Shushok Defendants: implied indemnity; equitable indemnity; apportionment; equitable estoppel; deceptive trade practices NRS 598.0915; fraud; fraudulent misrepresentation; intentional misrepresentation; negligent misrepresentation; and unjust enrichment.

## CONCLUSIONS OF LAW

### Reasonable to Believe WMCV and World Market Center are the Same Entity

1.     Global Accents' belief that World Market Center Las Vegas, Inc. and WMCV were the same entity was reasonable.  *See Collins v. Burns*, 103 Nev. 394, 397, 741 P.2d 819, 821 (1987) (citing *Sippy v. Cristich*, 4 Kan.App.2d 511, 609 P.2d 204, 208 (1980)) (justifiable reliance must be reasonable).  The terms "WMCV Phase 3, LLC," "World Market Center", and "World Market Center Las Vegas" were used interchangeably by WMCV and World Market Center Las Vegas directors, staff, employees, and leasing agents.  "World Market Center" is the name appearing on the facade of the World Market Center Las Vegas building.  "World Market Center Las Vegas" appeared on various business cards of the directors, staff, employees, and leasing agents of World Market Center Las Vegas.  "World Market Center" and "World Market Center Las Vegas" appeared on various email communications of World Market Center Las Vegas personnel to Global Accents.  WMCV's policy required its vendors to refer to it as "World Market Center Las Vegas," and it had this placement on all of its correspondence and communications to the outside world.  Furthermore, Global Accents only had one lease agreement with WMCV, so no confusion as to the distinction between World Market Center Las Vegas and WMCV was present, and it had no independent knowledge of the corporate structure and/or legal names of owners of the Property.  In that light, Global Accents' reliance that World Market Center Las Vegas, Inc. was the same as World Market Center Las Vegas and/or WMCV was reasonable under these circumstances.

### No Breach of Amended Global Accents Lease or Implied Covenant of Good Faith and Fair Dealing

2.     In an action for breach of contract, plaintiff bears the burden to show she was damaged and of proving the extent of those damages.  *Bergstrom v. Estate of DeVoe*, 109 Nev.

MICHAEL B. LEE, P.C.
2000 SO. EASTERN AVENUE
LAS VEGAS, NEVADA 89104
TEL – (702) 477.7030; FAX – (702) 477.0096

575, 578, 854 P.2d 860, 862 (1993).  Determining material breaches of contract depends on the nature and effect of the violation in light of how and the particular contract was viewed, bargained for, entered into, and performed by the parties.  *J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc.*, 120 Nev. 277, n.37 294, 89 P.3d 1009, 1020 (2004).  The common law uses five factors to determine if a material breach has occurred.  Restatement (Second) of Contracts § 241 (1981).  These factors include: (1) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (2) the extent to which the injured party can be adequately compensated for that part of the benefit of which he will be deprived; (3) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (4) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking into account of all the circumstances including any reasonable assurances; and (5) the extent to which the behavior of the party failing to perform or to offer to perform comports with the standards of good faith and fair dealing.  *Id.*

3.  Furthermore, liability for breach of the implied covenant of good faith and fair dealings arises "[w]here the terms of a contract are literally complied with but one party to the contract deliberately countervenes the intention and spirit of the contract, that party can incur liability for breach of the implied covenant of good faith and fair dealing."  *Hilton Hotels v. Butch Lewis Productions*, 107 Nev. 226, 232, 808 P.2d 919, 922-23 (1991).  In such a situation, the non-breaching party must prove that the other party acted "in a manner that is unfaithful to the purpose of the contract [such that] the justified expectations' of the non-breaching party are denied."  *Id.* at 234, 808 P.2d at 923.  "Whether the controlling party's actions fall outside the reasonable expectations of the dependent party is determined by the various factors and special circumstances that shape these expectations."  *Id.* at 234, 808 P.2d 923-24.

4.  Here, as explained in further detail below, WMCV cannot prevail on its cause for breach of lease and/or breach of the implied covenant of good faith and fair dealing as WMCV, by way of its agent with apparent authority, agreed to the Global Accents Release.  "[A] settlement agreement is a contract, its construction and enforcement are governed by principles of contract law.  *May v. Anderson*, 121 Nev. 668, 672, 119 P.3d 1254, 1257 (2005) (citing

*Reichelt v. Urban Inv. & Dev. Co.*, 611 F.Supp. 952, 954 (N.D.Ill.1985)).   Basic contract principles require, for an enforceable contract, an offer and acceptance, meeting of the minds, and consideration.  *Keddie v. Beneficial Insurance, Inc.*, 94 Nev. 418, 421, 580 P.2d 955, 956 (1978).  A contract can be formed when the parties have agreed to the material terms, even though the contract's exact language is not finalized until later.  *Matter of the Estate of Kern*, 107 Nev. 988, 991, 823 P.2d 275, 277 (1991).  In the case of a settlement agreement, a court can compel compliance when material terms are certain.  *May*, 121 Nev. at 672, 119 P.3d at 1257 (citations omitted).

   5. The terms of the Global Accents Release specified that:

> 2.  Termination of Lease.  As of the Termination Date, all parties to the Lease are fully and unconditionally released and discharged ((except as otherwise set out in this Agreement) from their respective obligations to perform each of the terms, covenants, and conditions set in the Lease and arising after the Termination Date.

> 5.  Mutual Release . . . Landlord and Tenant hereby release and forever discharge each other, and their respective partners, officers, directors, agents, trustees, beneficiaries, and employees, of and from any and all claims, acts, damages, demands, rights of action, and causes of action which each party ever had, now has, or in the future may have, against the other, arising from, under or in any way connected with the Lease.

> 6.  Compromise. . .  This Agreement is made entirely as a compromise and for the purpose of terminating the Lease and settling and extinguishing the respective claims, acts, damages, demands, rights of action, or causes of action of the parties hereto, expect as otherwise stated or reserved hereunder.

   6. The plain language of the Global Accents release terminated the Amended Global Accents Lease.  Similarly, it also released any claim for damages and causes of actions arising out of the Amended Global Accents Release.  Under the plain language of that agreement, WMCV cannot prevail in this action as a matter of law.

## No Basis for Unjust Enrichment

   7. Unjust enrichment occurs whenever a person has and retains a benefit that in equity and good conscious belongs to another.  *Mainor v. Nault*, 120 Nev. 750, 763, 101 P.3d 308, 317 (2004).  " 'The doctrine of unjust enrichment or recovery in quasi contract applies to situations where there is no legal contract but where the person sought to be charged is in

MICHAEL B. LEE, P.C.
2000 SO. EASTERN AVENUE
LAS VEGAS, NEVADA 89104
TEL – (702) 477.7030; FAX – (702) 477.0096

1   possession of money or property which in good conscience and justice he should not retain but

2   should deliver to another [or should pay for].' " *Leasepartners Corp. v. Robert L. Brooks Trust*

3   *Dated Nov. 12, 1975*, 113 Nev. 747, 942 P.2d 182, 187 (1997) (quoting 66 Am.Jur.2d Restitution

4   § 11 (1973)).   An unjust enrichment claim is "not available when there is an express, written

5   contract, because no agreement can be implied when there is an express agreement."   *Id.*

6   8.   However, the unclean hands doctrine "bars a party from receiving equitable relief

7   because of that party's own inequitable conduct."   *Las Vegas Fetish & Fantasy Halloween Ball,*

8   *Inc. v. Ahern Records, Inc.*, 182 P.3d 764, 766 (Nev. 2008) (quoting *Food Lion, Inc. S.L.*

9   *Nusbaum Ins. Agency, Inc.*, 202 F.3d 223, 228 (4th Cir. 2000)).   The unclean hands doctrine

10   precludes a party from attaining an equitable remedy when that party's "connection with the

11   subject-matter or transaction in litigation has been unconscientious, unjust, or marked by the

12   want of good faith."   *Id.* (quotation omitted).   Litigants seeking equity must come with "clean

13   hands."   *Tracy v. Capozzi*, 98 Nev. 120, 122, 642 P.2d 591, 593 (1982).

14   9.   Here, WMCV is barred from making a claim for unjust enrichment because of the

15   existence of the Amended Global Accents Lease and the Global Accents Release.   As these are

16   express written agreements, no agreement may be implied.   Furthermore, WMCV lacks clean

17   hands to make a claim for unjust enrichment as Ms. Dominguez, its employee in charge of

18   collections and in communication with Global Accents, affirmatively held out Shushok as having

19   full and final authority on behalf of WMCV as it relates to the dispute arising from the Amended

20   Global Accents Lease.   Furthermore, she reiterated this statement again when approached by Mr.

21   Partielli in February 2009.   Finally, WMCV lacks clean hands as it knew, on June 26, 2009, that

22   the Shushok Defendants continued working on the Global Accents account despite being

23   terminated in March 2009.   WMCV's failure to notify Global Accents at any time (until months

24   after the settlement is reached when Mr. Partielli contacted WMCV for leasing space) of the

25   Shushok termination despite having actual knowledge of the continued collection efforts marred

26   WMCV with unclean hands.

27   10.   Moreover, WMCV is not entitled to damages.   WMCV is not entitled to

28   declaratory relief or attorneys' fees as special damages.   Similarly, WMCV did not show any

**MICHAEL B. LEE, P.C.**
2000 SO. EASTERN AVENUE
LAS VEGAS, NEVADA 89104
TEL – (702) 477.7030; FAX – (702) 477.0096

evidence illustrate conscious disregard and/or implied malice, which precludes an award of punitive damages.

### WMCV is Bound by the Global Release Agreement

11.     A principal is bound by the acts of its agent while acting in the course of his or her employment, and a principal is liable for those acts within the scope of the agent's authority. *Nevada Nat'l Bank v. Gold Star Meat Co.*, 89 Nev. 427, 429, 514 P.2d 651, 653 (1973).  An agent's authority may be express, implied, or apparent.  *Dixon v. Thatcher*, 103 Nev. 414, 417, 742 P.2d 1029, 1031 (1987).  In Nevada, "apparent authority" is that authority which a principal holds its agent out as possessing, or permits the agent to exercise or to represent him- or herself as possessing, under such circumstances as to estop the principal from denying its existence. *Dixon*, 103 Nev. at 417, 742 P.2d at 1031; *Myers v. Jones*, 99 Nev. 91, 93, 657 P.2d 1163, 1164 (1983); *Gold Star Meat*, 89 Nev. at 429, 514 P.2d at 653.

12.     A principal may be bound by acts of its agent as to third parties who have no reason to know of the agent's improper conduct even when the agent acts for his own motives and without benefit to the principal.  *Homes Savings Assoc. v. General Electric Credit Corp.*, 101 Nev. 595, 600, 708 P.2d 280, 283 (1985).  In general, an agency relationship ends by: (1) agent's death; (2) principal's death, cessation of existence, or suspension of power; (3) principal's loss of capacity; (4) the conclusion of an agreement between the principal and agent where the agent should no longer reasonably conclude that the principal would assent to the agent's taking action of the principal's behalf; (5) a manifestation of revocation or a renunciation; or (6) the occurrence of a circumstance described by statute.  Restatement (Third) of Agency § 3.06(1)-(6).  However, even after a principal terminates an agent's actual authority, it does not end the apparent authority held by the agent.  *Id.* at § 3.11(1).  The apparent authority only ends when "it is no longer reasonable for the third party with whom an agent deals to believe that the agent continues to act with actual authority."  *Id.* at § 3.11(2).  Otherwise, "[a]pparent authority protects third parties who interact with an agent on the basis of the principal's prior manifestation and who lack notice that the agent's actual authority has terminated."  *Id.* at § 3.11, comment c.

MICHAEL B. LEE, P.C.
2000 SO. EASTERN AVENUE
LAS VEGAS, NEVADA 89104
TEL – (702) 477.7030; FAX – (702) 477.0096

**MICHAEL B. LEE, P.C.**
2000 SO. EASTERN AVENUE
LAS VEGAS, NEVADA 89104
TEL – (702) 477.7030; FAX – (702) 477.0096

13.     A party claiming apparent authority of an agent as a basis for contract formation must prove (1) that he subjectively believed that the agent had authority to act for the principal and (2) that his subjective belief in the agent's authority was objectively reasonable.  *Great Am. Ins. Co. v. Gen. Builders, Inc.*, 113 Nev. 346, 352, 934 P.2d 257, 261 (1997) (citing *Smith v. Hansen, Hansen & Johnson*, 63 Wash.App. 355, 818 P.2d 1127, 1135 (1991)).   Apparent authority is, in essence, an application of equitable estoppel, of which reasonable reliance is a necessary element.  *Id.* (citing *Ellis v. Nelson*, 68 Nev. 410, 418, 233 P.2d 1072, 1076 (1951) (additional citation omitted).  "The party who claims reliance must not have closed his eyes to warnings or inconsistent circumstances."  *Tsouras v. Southwest Plumbing and Heating*, 94 Nev. 748, 751, 587 P.2d 1321, 1322 (1978).  Apparent authority, including a third party's reasonable reliance on such authority, is a question of fact.  *Gen. Builders, Inc.*, 113 Nev. at 352, 934 P.2d at 261 (citing *Smith*, 818 P.2d at 1133).

14.     Here, WMCV cloaked Shushok in apparent authority to enter into the Global Accents Release.  The best illustration of objective belief is that three separate companies each individually subjectively believed, based on the conduct WMCV that Shushok had full and final authority to enter into, negotiate, and finalize release agreements for WMCV.  As to Global Accents, it is undisputed that WMCV retained Shushok to act as its commercial collection agent for the Global Accents account, that Ms. Dominguez represented to Mr. Partielli that Shushok had full and final authority of WMCV to negotiate a settlement, and that Mr. Birdwell represented to Mr. Partielli that he had full and final authority on behalf of WMCV to negotiate a settlement.  Notably, when Mr. Partielli would contact Ms. Dominguez during the negotiation period, she would refer him back to Shushok and specify that they had full and final authority of WMCV to resolve the lease dispute.   Ms. Dominguez never made any limitation on this authority, and specifically stated that Mr. Partielli needed to negotiate with Shushok to resolve the lease dispute before he could obtain new space.  In fact, Ms. Dominguez informed Mr. Partielli that she could not speak with him about the eviction issue, or any debt of Global Accents to WMCV, and represented to Mr. Partielli on behalf of WMCV that the Global Accents debt and all matters relating to any amounts owed from Global Accents to WMCV has been

referred and assigned to Shushok for collection and settlement, that only Shushok could discuss and settle any Global Accents debt to WMCV, that Shushok had full and final authority for WMCV to resolve any debt of Global Accents to WMCV, and instructed Mr. Partielli to discuss, negotiate, and settle any Global Accents debt with Shushok only and to pay Shushok upon reaching resolution.

15.     Furthermore, Mr. Kashani also cloaked Shushok with apparent authority to negotiate the Amended Global Accents Lease dispute for $8,200.  When Mr. Partielli called and explained that he had an offer from Shushok, Mr. Kashani stated it was a good deal and that Mr. Partielli should accept it.  As Mr. Kashani was the Co-Manager of WMCV and received weekly status reports regarding delinquent tenants, including Global Accents, he had some knowledge, actual or imputed, regarding the collection amounts and efforts.  This knowledge and his statements to Mr. Partielli to go forward with the settlement cloaked Shushok in apparent authority to enter into the Global Accents Release.  Further, Mr. Kashani did not warn or inform Mr. Partielli that Shushok had been terminated or that the settlement amount of $8,200 was shockingly low – rather, he told Mr. Partielli to go forward with it.

16.     Global Accents' subjective belief that Shushok had the apparent authority to enter into the Global Accents Release was reasonable.  Mr. Partielli subjectively believed in this authority based on the multiple statements by Ms. Dominguez that Shushok and full and final authority of WMCV to resolve the lease dispute.  He also had a subjective belief based on the statements of Mr. Birdwell, which were consistent with Ms. Dominguez's statements.  Finally, when Mr. Partielli, during the conversation with Mr. Kashani, he specifically mentioned he had been negotiating with Shushok and that the said $8,200 settlement offer was through Shushok.  As Mr. Kashani did not deny that Shushok had such authority, this further conferred subjective belief upon Mr. Partielli that Shushok had the apparent authority to enter into the Global Accents Release.

17.     Moreover, Global Accents belief that Shushok had authority to enter into the Global Accents Release was objectively reasonable.  Once again, three separate companies had formed an independent belief that Shushok had full and final authority to negotiate and enter into

MICHAEL B. LEE, P.C.
2000 SO. EASTERN AVENUE
LAS VEGAS, NEVADA 89104
TEL – (702) 477.7030; FAX – (702) 477.0096

release agreements on behalf of WMCV.  As to Global Accents, almost immediately after receiving communications from Mr. Maricich and Ms. Jesinger regarding the eviction, and his conversation with Ms. Dominguez, Mr. Birdwell contacted Mr. Partielli.  Furthermore, after Mr. Birdwell referred Mr. Partielli to Ms. Dominguez to discuss the lease issue in February 2009, she immediately referred him back to Mr. Birdwell and reiterated that Shushok had full and final authority of WMCV to resolve the lease dispute.  Finally, Mr. Partielli's conversation with Mr. Kashani, the co-manager of WMCV, the signatory of WMCV lease with Global Accents, a trusted person of Mr. Partielli, in July or August 2009, also reiterated that Shushok had authority to resolve the lease dispute when he advised Mr. Partielli to go forward with the settlement of $8,200, while Mr. Partielli had informed Mr. Kashani that such negotiations were had with Shushok and such offer had been made through Shushok for WMCV.

18.     $8,200 was objectively reasonable consideration for the Global Accents Release. The initial settlement offer by Shushok was $28,114.73.  However, Global Accents' position related to the surrender of the space after only occupying it for five days along with the payment for that use of approximately $9,000 (by way of security deposit maintained by WMCV and first month's rent paid at execution of the First Amended Global Accents Lease) provided a reasonable basis to dispute why the demand was too high.  The ultimate settlement offer reflected payment for two additional months of rent, which was a fair resolution in light of the square footage, location, and other issues related to the Global Accents Lease.  Mr. Kashani's actions confirm that the $8,200 settlement amount was objectively reasonable when he was not alarmed that such settlement amount was low when Mr. Partielli informed him of the settlement amount.  In total, Global Accents had reasonable reliance in Shushok's authority to enter into the Global Accents Release on behalf of WMCV.

19.     WMCV is bound by the Global Accents Release despite not knowing of Shushok's improper and self-motivated conduct.  *Homes Savings Assoc. v. General Electric Credit Corp.*, 101 Nev. 595, 600, 708 P.2d 280, 283 (1985).  WMCV admitted that it held out Shushok as its commercial collection agent to Global Accents in January 2009.  It also admitted that it knew, in June 2009, that Shushok continued to work on the Global Accents account

MICHAEL B. LEE, P.C.
2000 SO. EASTERN AVENUE
LAS VEGAS, NEVADA 89104
TEL – (702) 477.7030; FAX – (702) 477.0096

despite the removal of that file from it in March 2009. Similarly, despite having actual knowledge of Shushok's continued collection activities, WMCV never notified Global Accents that Shushok did not have the authority to continue with the negotiations and settlement of any debt by Global Accents to WMCV. As such, it was reasonable for Global Accents to believe that Shushok continued to act with actual authority. Restatement § 3.11(2). This apparent authority protected Global Accents on the basis of the WMCV's prior manifestations and lack notice that the agent's authority had terminated. *Id.* at § 3.11, comment c. While WMCV denies that Shushok had express authority, no dispute exists that Shushok had WMCV's apparent and/or implied authority. *Dixon v. Thatcher*, 103 Nev. 414, 417, 742 P.2d 1029, 1031 (1987). As such, WMCV is legally estopped from denying the existence of an agency relationship. *Dixon*, 103 Nev. at 417, 742 P.2d at 1031; *Myers v. Jones*, 99 Nev. 91, 93, 657 P.2d 1163, 1164 (1983); *Gold Star Meat*, 89 Nev. at 429, 514 P.2d at 653.

20.    WMCV cannot prevail on an action for breach of lease nor breach of implied covenant of good faith and fair dealing as it is bound by the Global Accents Release. The Global Accents Release, under paragraphs 2, 5, and 6 explicitly released any and all claims under the Global Accents Lease and/or the Amended Global Accents Lease. As such, WMCV, by way of the apparent authority of Shushok, released any claims for breach of lease and breach of implied covenant of good faith and fair dealing.

### WMCV Breached the Global Accents Release

21.    WMCV is in material breach of the Global Accents Release, including breach of the implied covenant of good faith and fair dealing. The plain language of that agreement specified that WMCV unconditionally released and discharged Global Accents from its respective obligations to perform each of the terms, covenants, and conditions set in the Global Accents Lease and Amended Global Accents Lease in consideration for a payment of $8,200.00. By bringing a lawsuit for breach of the Global Accents Lease and the Amended Global Accents Lease, WMCV materially breached paragraph 2 (Termination of Lease), 5 (Mutual Release), and 6 (Compromise). As such, Global Accents is entitled to the benefits of the Global Accents Release, which precludes the present action by WMCV, and an award of attorneys' fees in favor

**MICHAEL B. LEE, P.C.**
2000 SO. EASTERN AVENUE
LAS VEGAS, NEVADA 89104
TEL – (702) 477.7030; FAX – (702) 477.0096

of Global Accents.

22.     Paragraph 9(a) of the Global Accent Release specifies that "[i]f any is brought to enforce or interpret the terms of this Agreement or any obligations set out in this Agreement, the prevailing party, either by way of settlement or by final judgment, is entitled to recover its reasonable attorneys' fees, costs, and expenses." Trial Exhibit 26 at Glob 143. Global Accents is the prevailing party in this lawsuit on its claim for breach of contract and breach of the implied covenant of good faith and fair dealing. As such, it is entitled to recover its reasonable attorneys' fees, costs, and expenses. Global Accents may make a motion for attorneys' fees and demand costs pursuant to the Federal Rules of Civil Procedure, the Nevada Revised Statutes, and any other application rule, statute, or contract.

### The Shushok Defendants[7] are Liable to Global Accents

23.     Default was entered against Shushok for failure to have representation by counsel, and Mr. Turner and Mr. Birdwell's Answers were struck for failure to participate in the mandatory settlement conference. As to the Shushok Defendants, Global Accents is entitled to judgment against them for deceptive trade practices, fraud, fraudulent misrepresentation, intentional misrepresentation, and negligent misrepresentation. The fraud involved moral turpitude and intentional wrongdoing. There is a direct nexus between the Shushok Defendants and Global Accents as it relates to reliance in the fraud, and the benefits induced by the Shushok Defendants involved false pretenses, false representations, and actual fraud. As there is an agreement between Global Accents and Shushok, no cause of action lies for unjust enrichment. As WMCV did not prevail on its claims against Global Accents, implied indemnity, equitable indemnity, apportionment, and equitable estoppel are moot. Global Accents is entitled to recovery of its reasonable attorneys' fees, costs, and expenses as it relates to this action. Furthermore, it is also entitled to damages of $_____ for the deceptive trade practices, a treble award of $_____. Additionally, Global Accents is entitled to punitive damages for the fraud claims, for a total of $_____. In total, Global

---

[7]     As noted earlier, Mr. Travis filed a petition for Chapter 13 bankruptcy in Texas, and this action is not proceeding against him.

MICHAEL B. LEE, P.C.
2000 SO. EASTERN AVENUE
LAS VEGAS, NEVADA 89104
TEL – (702) 477.7030; FAX – (702) 477.0096

1   Accents is entitled to damages against the Shushok Defendants, joint and severally, in the

2   amount of **$_____.**

3       **JUDGMENT IS ENTER AS FOLLOWS**:  WMCV takes nothing on the claims for

4   breach of lease; breach of implied covenant of good faith and fair dealing; unjust enrichment;

5   declaratory relief; special damages for attorney fees; and punitive damages as to Global Accents.

6       **JUDGMENT IS FURTHER ENTERED AS FOLLOWS**:  Global Accents is the

7   prevailing party under the Global Accents Release.  It is entitled to reasonable attorneys' fees,

8   costs, and expenses related to its defense of this action.

9       **JUDGMENT IS FURTHER ENTERED AS FOLLOWS**:  Global Accents take

10  judgment in the sum of **$_____** against the Shushok Defendants, jointly and

11  severally with WMCV where Global Accents can collect against either, for its claims of

12  deceptive trade practices, fraud, fraudulent misrepresentation, intentional misrepresentation, and

13  negligent misrepresentation.

14      **JUDGMENT IS FURTHER ENTERED AS FOLLOWS**:  Global Accents may make

15  a motion for attorneys' fees and demand costs under the Federal Rules of Civil Procedure, the

16  Nevada Revised Statutes, and any other application rule, statute, or contract.  Global Accents

17  may seek recovery of these monies individually from WMCV.  WMCV will need to

18  subsequently seek contribution and/or apportionment for any mitigation of the fees for Shushok's

19  portion that does not affect Global Accents' ability to collect directly from WMCV.

20      Dated this ____ day of _____, 2013.

21

22                                          _____

23                                          GLORIA M. NAVARRO,
                                            United States District Court Judge

24

25

26

27

28

**MICHAEL B. LEE, P.C.**
2000 SO. EASTERN AVENUE
LAS VEGAS, NEVADA 89104
TEL – (702) 477.7030; FAX – (702) 477.0096